UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

MANCHESTER INC., NICE CARS
FUNDING, LLC, NICE CARS
ACCEPTANCE ACQUISITIONCO, INC.
AND NICE CARS OPERATIONS
ACQUISITIONCO, INC.

          Plaintiffs,

v.

RAY LYLE, VICTORIA LYLE, GINGER
BOND, RAY LYLE, II, ROBERT LYLE
AND UNITED STATES INTERNAL
REVENUE SERVICE

          Defendants.
_____

CIVIL ACTION NO. 07 CIV 8659 (LTS)

AMENDED COMPLAINT AND JURY
DEMAND

          Plaintiffs, Manchester Inc. ("Manchester"), Nice Cars Funding, LLC ("Funding"),

Nice Cars Acceptance AcquisitionCo, Inc.("NCA") and Nice Cars Operations AcquisitionCo,

Inc. ("NCO"), by their attorney, Richard D. Gaines, Esq., for their complaint allege as follows.

JURISDICTION AND VENUE

          1.     The claims alleged herein arise under Sections 10(b) and 20(a) of the Securities

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t, Rule 10b-5,

promulgated thereunder, and 17 C.F.R. §240.10b-5.

          2.     Jurisdiction of this Court is based upon Section 27 of the Exchange Act, 15

U.S.C. §78aa and 28 U.S.C. §1391(b).  The claims asserted herein arose in this District, the acts

and transactions complained of have occurred in this District.  Defendants have consented to the

jurisdiction and venue of this Court.

3.      In connection with the acts, transactions and conduct alleged herein, the defendants, directly and/or indirectly have used the means and instrumentalities of interstate commerce, including the United States mail, the internet and other forms of wire and electronic communication such as telephone and facsimile communications.

PARTIES

4.      Manchester is a corporation organized under the laws of the State of Nevada, with its principal office in Dallas Texas. It is a public company whose shares are publically traded over the counter.

5.      NCA is a corporation organized under the laws of the State of Delaware, with its principal office in Dallas, Texas.  NCA is a wholly owned subsidiary of Manchester.

6.      NCO is a corporation organized under the laws of the State of Delaware, with its principal office in Dallas, Texas.  NCA is a wholly owned subsidiary of Manchester.

7.      Funding is a limited liability company organized under the laws of the State of Delaware, with its principal office in Dallas, Texas.  Funding is a wholly owned subsidiary of NCA and, ultimately, Funding is a wholly owned indirect subsidiary of Manchester.

8.      Ray Lyle, Sr. ("Lyle") is an individual residing in Georgia who was the former President and 50% shareholder of each of Nice Cars, Inc. ("Nice Cars") and Nice Cars Capital Acceptance, Inc. ("Nice Cars Acceptance").  Lyle is currently President of NCA and NCO.

9.      Victoria  Lyle ("V. Lyle") is an individual residing in Georgia who was the former Secretary and 50% shareholder of each of Nice Cars and Nice Cars Acceptance (collectively the "Nice Cars Companies").  V. Lyle is the spouse of Lyle.  V. Lyle is currently Secretary of NCA and NCO.

2

10.    Prior to the acquisition of the Nice Cars Companies, Lyle and V. Lyle were the sole shareholders of each of the Nice Cars Companies and are collectively referred to herein as the "Shareholders".

11.    Ray Lyle, II ("Lyle II") is an individual residing in Georgia who was the Corporate Credit and Collections Manager of each the Nice Cars Companies.  Lyle II is a son of Lyle and V. Lyle.  Lyle is currently Corporate Credit and Collection Manager of NCA and NCO.

12.    Robert  Lyle ("R. Lyle"). is an individual residing in Georgia who was the former General Manager of each of the Nice Cars Companies.  He is a son of Lyle and V. Lyle.  R. Lyle is currently General Manager of NCA and NCO.

13.    Ginger Bond ("Bond") is an individual residing in Georgia who was the former HR Manager of each of the Nice Cars Companies.  She is a daughter of Lyle and V. Lyle.  Bond is currently HR Manager of NCA and NCO.  Lyle, V. Lyle, Lyle II, R. Lyle and Bond are collectively referred to herein as the "Lyle Defendants"

14.    The United States Internal Revenue Service (the "IRS") is an agency of the government of the United States.  The Shareholders used the proceeds they received from the sale of the stock of the Nice Cars Companies to plaintiffs to pay more than $9.6 million to the IRS to settle tax liabilities unrelated to the sale of the stock of the Nice Cars Companies.

GENERAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

15.    Nice Cars was in the business of selling used automobiles and trucks to consumers who had impaired credit or limited credit histories.  The customers are generally referred to as sub-prime customers.  The category of the used car market in which Nice Cars operated is generally referred to as the "Buy-Here/Pay-Here" used car market.

16.     Nice Cars Acceptance was a related finance company that purchased at a discount from Nice Cars consumer notes issued to Nice Cars in connection with the sale of used vehicles.

17.     In or about the beginning of 2006, Manchester entered into negotiations with Lyle and V. Lyle to purchase all the outstanding capital stock of the Nice Cars Companies from Lyle and V. Lyle.

18.     In connection with such negotiations, Lyle and V. Lyle provided to Manchester, its attorneys, consultants and other representatives as well as the lender from which Manchester was borrowing the funds to finance the transaction (the "Lender") substantial information concerning the current and historical business, operations and financial condition of the Nice Cars Companies. The information was provided in the form of documents or oral assertions of fact, all of which were represented to be true and accurate.

19.     The information and representations made with respect to the Nice Cars Companies included, but were not limited to the following:

a.      the Nice Cars Companies had generated net pre-tax profits of in excess of $11 million dollars during calendar years 2003, 2004 and 2005;

b.      For the eight months period ended August 31, 2006, pre tax profits were $6.7 million;

c.      Pretax profits for the full year 2006, based on the first eight months' performance, were projected to be $8.5 - $9 million;

d.      Nice Car Companies profits as reflected in the financial statements provided to plaintiffs showed profits growing from the year ended 2003 through August 31, 2006 at a 40% compound annual rate of growth; and

4

e.      the historical losses on consumer notes owned by Nice Cars Acceptance as a

percentage of the notes originated did not exceed 30% of the loans originated (the

historical loss percentage is referred to herein as the "static pool data").

20.    Upon information and belief, at or about the time of the negotiations between

Manchester and the Shareholders concerning Manchester's acquisition of the outstanding stock

of the Nice Cars Companies (the "Acquisition"), the Shareholders were in negotiations with the

IRS concerning tax liabilities the IRS was asserting against the Shareholder including potential

civil and criminal penalties (such tax liabilities and potential civil and criminal penalties are

referred to herein as the "IRS Claims").

21.    Upon information and belief, the Shareholders were negotiating to avoid having

the IRS pursue the IRS Claims by agreeing to pay to the IRS a substantial sum in settlement of

the IRS Claims.

22.    Upon information and belief the only potential source of the funds available to the

Shareholders needed to pay the amount required by the IRS to settle the IRS Claims was through

the sale of the Nice Cars Companies to Manchester.

23.    Upon information and belief, the IRS was fully aware that the only source of the

funds to settle the IRS Claims available to the Shareholders was the sale of the Nice Cars

Companies to Manchester.

24.    Upon information and belief, commencing in or about the beginning of 2006, the

Lyle Defendants, acting in concert, embarked upon a plan and scheme to artificially inflate the

value of the Nice Cars Companies by increasing sales and the generation of consumer notes

owned by the Nice Cars Companies through lowering credit standards required to be approved

for credit to buy used vehicles sold by Nice Cars and substantially reducing the down payments required to purchase a vehicle on credit (the "Scheme").

25.    Upon information and belief, in or about the time Manchester and the Shareholders were negotiating the price of acquiring the stock of the Nice Cars Companies, in furtherance of the Scheme, the Lyle Defendants caused the Nice Cars Companies to materially change the way they conducted their business, including but not limited to, materially changing underwriting standards used to evaluate the credit worthiness of customers by lowering those standards materially.

26.    The purchase price being negotiated between Manchester and the Shareholders was substantially related to the aggregate Eligible Receivables (as defined below) owned by the Nice Cars Companies.  Eligible Receivables were understood by the plaintiffs and defendants to mean consumer notes receivable not contractually past due more than 60 days.

27.    In or about the spring - summer of 2006, Manchester and the Shareholders reached a tentative agreement on a purchase price for the stock of the Nice Cars Companies (the "Purchase Price") based upon the representations and documents the Shareholders provided to Manchester in respect of the Nice Cars Companies.

28.    An integral part of the negotiation of the Purchase Price were the representations and warranties the Shareholders would provide concerning the Nice Cars Companies, including representations with respect to the current and historical business, financial and operating condition of the Nice Cars Companies.  To the extent the representations and warranties were inaccurate, a portion or all of the Purchase Price would be returned to plaintiffs.

6

29.     Upon information and belief, the IRS was fully aware of the conditions of the sale of the stock of the Nice Cars Companies and the potential that some portion or all of the Purchase Price, including the amounts to be paid to them in settlement of the IRS Claims, would have to be returned to plaintiffs if the representations and warranties were not accurate.

30.     Prior to the closing of the Acquisition, Shareholders assisted outside auditors to audit the financial statements of the Nice Cars Companies for the fiscal years 2003-2005.  Upon information and belief, many of the same representations made to the plaintiffs concerning the current and historical business, financial and operating condition of the Nice Cars Companies was made to the auditors.

31.     Those audited financial statements along with the unaudited financial statements of the Nice Cars Companies were provided to Manchester and represented to fairly reflect the financial performance and position of the Nice Cars Companies for the periods indicated.

32.     To effect the acquisition of the Nice Cars Companies, Manchester created two acquisition subsidiaries, NCA to acquire the all the stock of Nice Cars Acceptance and NCO to acquire the all the stock of Nice Cars.

33.     To provide the funds to effect the purchase of the Nice Cars Companies, Manchester created Funding which entered into a loan agreement with its Lender pursuant to which it would borrow the funds necessary to pay the cash portion of the consideration for the stock of the Nice Cars Companies and to provide ongoing working capital.

34.     On October 4, 2006, the Shareholders entered into stock purchase agreements to sell all their shares in the Nice Cars Companies and on such date the Acquisition was consummated.  The stock purchase agreement pursuant to which the shares of Nice Cars

Acceptance were sold to NCA was among the Shareholders, Nice Cars Acceptance, NCA and Manchester (the "Nice Cars Acceptance SPA").   The stock purchase agreement pursuant to which the shares of Nice Cars were sold to NCO was among the Shareholders, Nice Cars, NCO and Manchester (the "Nice Cars SPA").

35.    Nice Cars and Nice Cars Capital Acceptance were merged into NCI and NCA, respectively, after the Acquisition with NCI and NCA being the surviving entities.

36.    Under the terms of the Nice Cars Acceptance SPA, the consideration for Nice Cars Acceptance was as follows:

a.    $15,345,000 in cash;

b.    5,568,750 common shares of Manchester;

c.    A note to the Shareholders in the amount of $6,930,000 (the "Purchase Note");

d.    A note in the face amount of $1,814,000 for tax reimbursement (the "S Tax Reimbursement Note");

e.    A note in the amount of $627,543 (the "Shareholder Note")

37.    Included within the terms of the  Nice Cars Acceptance SPA were representations and warranties made by each of the Shareholders with respect to Nice Cars Acceptance.  The representations contained in Section 3.4 are based upon the following lead in paragraph to each representation

> As an inducement to the Company and the Parent to enter into this Agreement and to consummate the transactions contemplated herein, each of the Shareholders, jointly and severally, represent and warrant to the Company and the Parent as follows regarding matters pertaining to NCCAC, all of which are true and complete as of the date of this Agreement and as of the Closing, except to the extent set forth on a disclosure schedule attached hereto

referencing the section and paragraph number of the provision herein corresponding to such exception:

a.    The following specific representations are contained in Section 3.4 of the Nice Cars Acceptance SPA following the quoted language in ¶37, above -

i.    (j)    Validity of Financial Statements.  The audited financial statements of NCCAC prepared by Rodefer Moss & Co, PLLC as of December 31, 2005, December 31, 2004 and December 31, 2003 are true and correct and have been prepared in accordance with generally accepted accounting principles applied on a consistent basis during the periods involved (except as may be otherwise indicated in such financial statements or the notes thereto) and fairly present in all material respects the financial position of NCCAC as of the dates thereof and the results of operations and cash flows for the periods then ended.  The unaudited balance sheets and profit and loss statements for the six-month period ended June 30, 2006 and the months ended July 31, 2006 and August 31, 2006, which the Shareholders have delivered to the Company and the Parent fairly present in all material respects the financial position of NCCAC as of the dates thereof.

ii.    (g)    No Undisclosed Liabilities.  NCCAC has no liabilities or obligations that are material, individually or in the aggregate, and that are not disclosed in (i) the financial statements described in Section 3.4(j) of this Agreement; (ii) the releases attached as <u>Exhibit J</u> hereto; or (iii) as disclosed on Schedule 3.4(g) of this Agreement, other than those incurred in the ordinary course of NCCAC's business and which, individually or in the aggregate, are not material to NCCAC.  The minute books and other records of NCCAC contain a true and complete record, in all material respects, of all action taken at all meetings and by all written consents in lieu of meetings of directors, members, shareholders, the management committee or boards of directors, subcommittees and committees of the boards of directors of NCCAC.

iii.    (h)    No Undisclosed Events or Circumstances.  Except as set fort on Schedule 3.4(h), no event or circumstance has occurred or exists with respect to NCCAC or its business, properties, prospects, operations or financial condition, that, under applicable law, rule or regulation, would require public disclosure under the Securities Act and/or Exchange Act if NCCAC were subject to the reporting requirements of Sections 13 or 15 of the Exchange Act that has not been disclosed in writing to the Company or the Parent.

    iv.    (n)    Absence of Certain Changes and Events.  Except as set forth on Schedule 3.4(n), since the end of the period covered by the audited financial statements for the year ended December 31, 2005, the business of NCCAC has been conducted only in the ordinary course consistent with prior practice and NCCAC has not: (a) transferred, leased or otherwise disposed of any of its assets or properties other than in the ordinary course of business; (b) waived, released or terminated any material rights, Claims, contracts or leases, as applicable; (c) suffered any material damage, destruction or loss, whether or not such damage, destruction or loss shall have been insured against; (d) suffered any material adverse change in the financial condition, properties or business; or (e) made or entered into any contract or commitment to make any capital expenditure in excess of $100,000.  Except as set forth on Schedule 3.4(n), since August 31, 2006, there have not been any dividends or other distributions from NCCAC to any shareholder of NCCAC.

    v.    (w)    Accounts Receivable.  The accounts receivable carried in NCCAC's books and records: (i) are valid; (ii) have arisen solely out of bona fide performance of services and other business transactions in the ordinary course of business consistent with past practice, in each case, with persons other than affiliates; (iii) are not subject to any prior lien and are not subject to valid defenses, set-offs or counterclaims, and there are no refunds, discounts or other adjustments payable in respect of such accounts receivable; and (iv) are collectable in accordance with their terms, subject to the historical bad debt expense incurred by NCCAC.

38.    Under the terms of the Nice Cars SPA, the consideration for Nice Cars was as follows:

    a.    $2,475,000 in cash;

    b.    618,750 common shares of Manchester;

    c.    the S Tax Reimbursement Note;

    d.    the Shareholder Note.

39.    At the closing of the Acquisition the closing price of Manchester's publically traded stock was $7.52 per share.  At this price, the value of the shares received by Shareholders

was $46,530,000.  The shares received by Shareholders represented 20% of the outstanding

shares of Manchester.

      40.     Included within the terms of the  Nice Cars SPA were representations made by

each of the Shareholders with respect to Nice Cars.  The representations contained in Section 3.4

are based upon the following lead in to each representation

> As an inducement to the Company and the Parent to enter into this
> Agreement and to consummate the transactions contemplated
> herein, each of the Shareholders, jointly and severally, represent
> and warrant to the Company and the Parent as follows regarding
> matters pertaining to NCI all of which are true and complete as of
> the date of this Agreement and as of the Closing, except to the
> extent set forth on a disclosure schedule attached hereto
> referencing the section and paragraph number of the provision
> herein corresponding to such exception:

     a.     The following specific representations are contained in Section 3.4 of the Nice

Cars Acceptance SPA following the quoted language in ¶40, above -

     i.     (j)     Validity of Financial Statements.  The audited financial statements
of NCI prepared by Rodefer Moss & Co, PLLC as of December 31, 2005,
December 31, 2004 and December 31, 2003 are true and correct and have
been prepared in accordance with generally accepted accounting
principles applied on a consistent basis during the periods involved
(except as may be otherwise indicated in such financial statements or the
notes thereto) and fairly present in all material respects the financial
position of NCI as of the dates thereof and the results of operations and
cash flows for the periods then ended.  The unaudited balance sheets and
profit and loss statements for the six-month period ended June 30, 2006
and the months ended July 31, 2006 and August 31, 2006, which the
Shareholders have delivered to the Company and the Parent fairly present
in all material respects the financial position of NCI as of the dates
thereof.

     ii.     (g)     No Undisclosed Liabilities.  NCI has no liabilities or obligations
that are material, individually or in the aggregate, and that are not
disclosed in (i) the financial statements described in Section 3.4(j) of this
Agreement; (ii) the releases attached as <u>Exhibit J</u>  hereto; or (iii) as
disclosed on Schedule 3.4(g) of this Agreement, other than those incurred

in the ordinary course of NCI's business and which, individually or in the aggregate, are not material to NCI. The minute books and other records of NCI contain a true and complete record, in all material respects, of all action taken at all meetings and by all written consents in lieu of meetings of directors, members, shareholders, the management committee or boards of directors, subcommittees and committees of the boards of directors of NCI.

iii.    (h)    No Undisclosed Events or Circumstances. Except as set fort on Schedule 3.4(h), no event or circumstance has occurred or exists with respect to NCI or its business, properties, prospects, operations or financial condition, that, under applicable law, rule or regulation, would require public disclosure under the Securities Act and/or Exchange Act if NCI were subject to the reporting requirements of Sections 13 or 15 of the Exchange Act that has not been disclosed in writing to the Company or the Parent.

iv.    (n)    Absence of Certain Changes and Events. Except as set forth on Schedule 3.4(n), since the end of the period covered by the audited financial statements for the year ended December 31, 2005, the business of NCI has been conducted only in the ordinary course consistent with prior practice and NCI has not: (a) transferred, leased or otherwise disposed of any of its assets or properties other than in the ordinary course of business; (b) waived, released or terminated any material rights, Claims, contracts or leases, as applicable; (c) suffered any material damage, destruction or loss, whether or not such damage, destruction or loss shall have been insured against; (d) suffered any material adverse change in the financial condition, properties or business; or (e) made or entered into any contract or commitment to make any capital expenditure in excess of $100,000. Except as set forth on Schedule 3.4(n), since August 31, 2006, there have not been any dividends or other distributions from NCI to any shareholder of NCI.

v.    (w)    Accounts Receivable. The accounts receivable carried in NCI's books and records: (i) are valid; (ii) have arisen solely out of bona fide performance of services and other business transactions in the ordinary course of business consistent with past practice, in each case, with persons other than affiliates; (iii) are not subject to any prior lien and are not subject to valid defenses, set-offs or counterclaims, and there are no refunds, discounts or other adjustments payable in respect of such accounts receivable; and (iv) are collectable in accordance with their terms, subject to the historical bad debt expense incurred by NCI.

41.     At the closing of the Acquisition (the "Closing Date"), the Nice Cars Companies' aggregate Eligible Receivables were approximately $67.7 million.  In addition to the Eligible Receivables there were approximately $16.8 million of ineligible accounts receivable which had not been charged off.

42.     All of the Nice Cars Companies' accounts receivable secured bank debt in the amount of approximately $34.9 million.

43.     In order to purchase the Nice Cars Companies, Funding used the accounts receivable acquired from the Nice Cars Companies as collateral.  Based on that collateral Funding borrowed from Lender 80% of the Eligible Receivables.

44.     The proceeds of the loan from the Lender were used to pay off the outstanding bank debt of approximately $34.9 million and the cash portion of the consideration for the Nice Cars Companies of approximately $17.8 million.

45.     Based on the static pool data provided by Shareholders to plaintiffs and their Lender, including the weighted average age and the historical bad debt expense, which was represented to be less than 30%, of the Eligible Receivables at Closing Date, the projected total defaults on such Eligible Receivables over the three to four year remaining life of the pool of notes would be approximately $9 million.

46.     Almost immediately after the Acquisition, the amount of note defaults began to exceed the historical default rates, as represented to plaintiffs, significantly.

47.     Lyle represented to plaintiffs and their representatives that the sudden increase in defaults was an aberration and the number of defaults would return to historical rates.

48.     In reliance on this representation, Manchester borrowed additional funds to provide operating capital to NCO and NCA, including funds from the Shareholders.  Manchester incurred interest on such borrowings, including the borrowings from the Shareholders.

49.     In fact, the defaults on the Eligible Receivables did not reduce significantly.

50.     On numerous occasions thereafter, Lyle represented to plaintiffs that the defaults were either not more than they were historically or that it was a temporary down turn in the economy and that things would improve.

51.     In reliance on these representations, plaintiffs continued to permit the Lyle Defendants to operate NCO and NCA.

52.     During the 11 month period from the closing of the Acquisition to through the end of August 2007 the total charge-off Eligible Receivables that existing immediately prior to closing of the Acquisition was approximately $34 million.  This represented approximately four times the level of defaults projected for *the entire remaining life* of the pool of Eligible Receivables at the closing of the Acquisition.

53.     Based on the rate of defaults experienced during the first 11 months, it is projected that there will be an additional $5 million of defaults on the original pool of Eligible Receivables.

54.     The original pool of Eligible Receivables at closing of the Acquisition was $67.7 million.  The defaults since the Acquisition through the end of August 2007 represent about 53% of the Eligible Receivables.

55.     The loss suffered by plaintiffs to date as a result of the defaults through August 31, 2006 plus projected losses are at least $22.4 million.

14

56.     Nice Cars Acceptance had a reserve allowance on its books of $27.2 million to provide for the anticipated losses on the notes receivable.  This reserve was represented to be adequate.

57.     Based on losses incurred by plaintiffs in terms of actual defaults and projected defaults on the Eligible Receivables at the Closing Date, the reserves were understated by not less than $12 million.

58.     The reserves reflected in the financial statements were grossly inadequate.

59.     Had the financial statements reflected the proper reserves and the profit and loss statements been adjusted accordingly, there would have been no profits for the years of 2006 and 2005.

60.     An analysis of the level of losses attributable to the original Eligible Receivables at closing has led to the inescapable conclusion that the reserves for losses as reflected on the financial statements and the profits reflected on such statements, which statements were represented to fairly reflect the financial condition of the Nice Cars Companies in ¶¶3.4(i) of the Nice Cars SPA and Nice Cars Acceptance SPA, were materially and grossly inadequate in the case of the reserves and materially and grossly overstated in the case of the profits.

61.     The representations described in paragraphs 37 and 40, above were not accurate at the time they were made.

62.     Upon information and belief, such representations as well as others were made by the Shareholders, aided and abetted by the other Lyle Defendants, with the knowledge that they were false and misleading and were made with the specific intent that plaintiffs rely on such representations.

63.     Plaintiffs reasonably relied upon such representations to their detriment and have been damaged thereby.

64.     Had the proper reserves been reflected on the financial statements of the Nice Cars Companies, the profits reflected for 2006 and 2005, at least, would have been eliminated.

65.     As a result of the foregoing, the financial statements referred to in ¶¶3.4(i) of the Nice Cars SPA and Nice Cars Acceptance SPA did not fairly present the financial condition of the Nice Cars Companies or their financial performance.

66.     The inadequacy of the reserves also makes the representation contained in ¶¶3.4(g) of the Nice Cars SPA and Nice Cars Acceptance SPA to the effect that there were no unknown liabilities false.  In this case the offset to be charged against the accounts receivable were grossly understated.

67.     The false representations as described in ¶¶65 and 66, above require disclosure to insure the accuracy of the representations contained in ¶¶3.4(h) of the Nice Cars SPA and Nice Cars Acceptance SPA to the effect that there is no circumstance that would require disclosure under the Securities Act and/or the Exchange Act if Nice Cars and/or Nice Cars Acceptance were subject to the reporting requirements of Section 13 or 15 of the Exchange Act.

68.     No disclosure was made under ¶¶3.4(h) of the Nice Cars SPA and Nice Cars Acceptance SPA and as a result that representation was not accurate.

69.     Upon information and belief, the Shareholders knew that the financial statements did not fairly present the financial condition and performance of the Nice Cars Companies, did not disclose the true level of offset to the accounts receivable and did not disclose the foregoing information which a reporting company under Section 13 or 15 of the Exchange Act would have

been obligated to disclose prior to making such representations. The Shareholders made such knowingly false representations with the intent that plaintiffs rely on such representations.

70.    The Shareholders concealment of the true financial, business and operating condition of the Nice Cars Companies was knowingly and deliberately aided and abetted by the other Lyle Defendants who also failed to disclose the true condition of the Nice Cars Companies prior to the Closing Date.

71.    Plaintiffs relied on such representations to their detriment.

72.    Upon information and belief, in an effort to artificially increase the notes receivable it owned, the Shareholders caused the Nice Cars Companies to reduce the standards for determining the customers who would qualify for credit to purchase used vehicles from Nice Cars. These changes included, but were not limited to substantially reducing the amount of down payments customers were required to pay purchase their vehicles.

73.    Upon information and belief, Shareholders knew that the changes they made in underwriting were a significant departure from their historical practices and would result in higher than represented historical defaults on the notes such customers issued at the time they made the representations.

74.    The change in the credit standards constituted a change in the manner in which they conducted their business compared to the way it was conducted at December 31, 2005.

75.    In ¶¶3.4(n) of the Nice Cars SPA and Nice Cars Acceptance SPA, the Shareholders represented that there had been no change from the course of business as it was conducted at December 31, 2005.

76.     The Shareholders failed to disclose the change in the course of business as required by ¶¶3.4(n) of the Nice Cars SPA and Nice Cars Acceptance SPA and as a result thereof, the representation was false.

77.     Upon information and belief, at the time they made the representations contained in ¶¶3.4(n) of the Nice Cars SPA and Nice Cars Acceptance SPA, they knew they were false and made them with the specific intent that plaintiffs rely on them.

78.     Plaintiffs relied on such representations to their detriment.

79.     In ¶¶3.4(w) of the Nice Cars SPA and Nice Cars Acceptance SPA, the Shareholders represented that the accounts receivable were collectible subject only to the historical bad debt expense.  For the reasons discussed at ¶¶45 through 54, above, the accounts receivable were not collectible subject to the historical bad debt expense.

80.     The representations made in ¶¶3.4(w) of the Nice Cars SPA and Nice Cars Acceptance SPA were false.

81.     Upon information and belief, at the time they made the representations contained in ¶¶3.4(w) of the Nice Cars SPA and Nice Cars Acceptance SPA, they knew they were false and made them with the specific intent that plaintiffs rely on them.

82.     Plaintiffs relied on such representations to their detriment and were damaged, including but not limited to, to the extent and in the manner set forth in the Indemnification Demand attached hereto as Exhibit 1 and as set forth below.

83.     Upon information and belief, at the time the Shareholders were negotiating with the IRS, they lacked the resources to pay the amounts needed to settle the dispute with the IRS.

84.     Upon information and belief involved with the Shareholder's motive to defraud plaintiffs was the specific purpose of defrauding plaintiffs of sufficient sums to pay the IRS the amounts they required. to settle and/or avoid further civil and criminal liability.

85.     Shareholders used $9.6 million of the cash proceeds unlawfully received from plaintiffs to settle the IRS Claims with the IRS.

86.     The foregoing fraudulent representations made by Shareholders, aided and abetted by the other Lyle Defendants, constitute a criminal misdemeanor under the New York Martin Act.

87.     As a result of the foregoing false and deliberating misleading representations and warranties, plaintiffs have been damaged including but limited to as set forth below.

88.     As a result of the Lyle Defendants' misrepresentation of the historical bad debt expense as discussed above, plaintiffs have been damaged in an amount of not less than $22.4 million.

89.     As a result of the Lyle Defendants' provision of false and misleading financial statements, plaintiffs were defrauded and grossly overpaid for the Nice Cars Companies.  Had the true financial condition been disclosed, the consideration paid for the Nice Cars Companies would have been payment of the existing bank debt at Closing of $34.9 million plus $1.4 million in cash and nothing more.

90.     The following consideration would not have been paid to the Shareholders:

a.      6,187,000 shares of Manchester stock;

b.      The $6,930,000 Purchase Note;

c.      The $$1,814,000 S Tax Note; and

      d.      The $627,543 Shareholder Note.

91.      Had the financial statements not be materially false and misleading, a number of expenses and costs would not have been incurred by plaintiffs, including, but not limited to, the following.

      a.      The interest cost of 17.25% plus other costs associated with plaintiffs' borrowing $16.4 million of funds it would not have had to borrow;

      b.      The principal and interest unnecessarily paid with respect to the Purchase Note, S Tax Note and Shareholder Note;

      c.      The making of approximately $170,000 of charitable contributions to charities designated by Shareholders, which contributions were made based upon non-existent profits arising from the high default rate related to Eligible Receivables;

      d.      The plaintiffs incurring $3,415,000 in debt to fund operating shortfalls at the Nice Cars Companies; and

      e.      The loss of approximately $6 million in operating profits the Nice Cars Companies would have earned had the Eligible Receivables in existence at the Closing Date suffered defaults in accordance with the represented historical bad debt expense.

92.      Manchester has a stated business strategy to acquire used car dealers who are in the Buy-Here/Pay-Here used car business.  An integral part of the strategy is to use the value of its publically traded stock as consideration for its acquisitions.

93.      Since the Acquisition Manchester has suffered substantial losses as result of the high default rate of the original notes it acquired when it acquired the Nice Cars Companies.

94.     Since the Acquisition the price of Manchester's stock has dropped significantly to its present level.

95.     The reduction in value has effectively increased the cost of acquiring companies and Manchester has been damaged thereby.

96.     Had the Eligible Receivables acquired with the Acquisition performed as represented, Manchester would have had substantially more operating profits than it had and the price of its stock would have reflected that performance.

97.     As a result of the foregoing Manchester has been damaged.

98.     As a condition to closing the Acquisition, Manchester entered into employment agreements with the Lyle Defendants in reliance on the representations made to plaintiffs as to the financial and other conditions and performance of the Nice Cars Companies.

99.     In the absence of such false representations, Manchester would not have entered into the employment contracts with the Lyle Defendants on the terms thereof.

100.    The unlawful and illegal acts described above constitute a breach of the employment agreements of the respective Lyle Defendants and are grounds for termination for cause under such agreements.

101.    Upon information and belief, the Shareholders do not have resources to pay to plaintiffs money damages and plaintiffs beyond $7 million and are judgment proof for amounts in excess of $7 million.  Plaintiffs only remedy to be partially made whole is to recover from the IRS the funds fraudulently taken and converted from plaintiffs.

102.    Plaintiffs damages far exceed the funds that can be recovered from the Lyle Defendants.

103.    The IRS has been unjustly enriched as a result of the execution of the Scheme by which plaintiffs were defrauded of their funds so that the Shareholders could illegally use those funds to avoid liability on the IRS Claims by funding the settlement with the IRS.

FIRST CLAIM

104.    As and for plaintiffs' first claim against the Lyle Defendants, plaintiffs repeat and reallege the allegations set forth in ¶¶1 through 103, above with the same force and effect as though fully set forth at length herein.

105.    At all relevant times, the Lyle Defendants, individually and in their corporate capacities on behalf of the Nice Cars Companies, each and in concert with one another, directly and/or indirectly by the use and means of instrumentalities of interstate commerce and/or the United States mail, engaged in a continuous course of conduct and conspiracy to conceal material information from Manchester and its subsidiaries in connection with the purchase and/or sale of stock in Manchester and the Nice Cars Companies.

106.    Upon information and belief, the Lyle Defendants employed devices, schemes and artifices to defraud, while in possession of material information and facts which they knew were contrary to information they had disclosed to plaintiffs relating to their acquisition of Manchester securities and sale of the Nice Cars Companies securities.

107.    The aforesaid conduct and actions of the Lyle Defendants in the making of, or participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements in light of the circumstances under which they were made not misleading regarding, among other things, the purchase and/or sale of Manchester securities and the securities of the Nice Cars Companies, and otherwise engaging in

transactions, practices and courses of conduct which directly and/or indirectly proximately resulted in the perpetration of a fraud and deceit upon plaintiffs.

108.    The false and misleading statements, misrepresentations, nondisclosures and/or omissions of material fact set forth above in connection with the sale and/or purchase of the foregoing securities were effected by means and instrumentalities of interstate commerce and the United States mail.

109.    By reason of the foregoing, the Lyle Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. §78j and Rule 10b-5 thereunder and 17 C.F.R. §240.10b-5.

110.    Had plaintiffs known of the aforesaid conduct and actions, Manchester would not have included any its stock or any of the Notes as part of the consideration and would have reduced the cash portion of the consideration paid for the stock of the Nice Cars Companies by an amount of not less than $16.4 million.

111.    The Lyle Defendants each knew the false and misleading statements, misrepresentations, nondisclosures and/or omissions of material fact set forth above in connection with the sale and/or purchase of Manchester, the Nice Cars Companies securities.

112.    Plaintiffs seek rescission of the payment of the Manchester stock and the Notes as part of the consideration for the stock of the Nice Cars Companies.

113.    Plaintiffs reasonably relied upon the aforesaid false and misleading statements to their detriment and as a direct and proximate result thereof have been severely damaged.

114.    The actions of the Lyle Defendants was willful and malicious and justify the award of punitive damages.

SECOND CLAIM

23

115.    As and for plaintiffs' second claim against the Lyle Defendants, plaintiffs repeat and reallege the allegations set forth in ¶¶1 through 114, above with the same force and effect as though fully set forth at length herein.

116.    Plaintiffs reasonably relied upon the aforesaid false and misleading statements to their detriment and as a direct and proximate result thereof have been severely damaged.

117.    The Lyle Defendants are jointly and severally liable to plaintiffs for commonlaw fraud.

118.    The actions of the Lyle Defendants was willful and malicious and justify the award of punitive damages.

THIRD CLAIM

119.    As and for plaintiffs' third claim against the Lyle Defendants, plaintiffs repeat and reallege the allegations set forth in ¶¶1 through 118, above with the same force and effect as though fully set forth at length herein.

120.    The Shareholders breached the representations and other terms of the Nice Cars SPA and the Nice Cars Acceptance SPA.

121.    As a result thereof plaintiffs suffered substantial damages, including, but not limited to, the losses reflected in Exhibit 1, lost profits, reduction in the value of assets, over payment of consideration for the Nice Cars Companies, the making of charitable contributions, diminution in the price of Manchester Inc.'s stock to the detriment of its shareholders  and paying salaries it otherwise would not have paid but for the breaches of the relevant agreements.

## FOURTH CLAIM

122.    As and for plaintiffs' fourth claim against the Lyle Defendants and the IRS, plaintiffs repeat and reallege the allegations set forth in ¶¶1 through 121, above with the same force and effect as though fully set forth at length herein.

123.    As a result of the foregoing unlawful and illegal acts, the Shareholders defrauded plaintiffs and converted their lawful property, including transferring more than $9.6 million to the IRS.

124.    Plaintiffs have a superior right to the more than $9.6 million paid to the IRS and such sums should be remitted to them.

125.    As a result of the forgoing fraud, Shareholders, aided and abetted by the other Lyle Defendants, have damaged plaintiffs.

126.    The actions of the Lyle Defendants was willful and malicious and justify the award of punitive damages.

## FIFTH CLAIM

127.    As and for plaintiffs' fifth claim against the IRS, plaintiffs repeat and reallege the allegations set forth in ¶¶1 through 126, above with the same force and effect as though fully set forth at length herein.

128.    Through the unlawful and illegal fraud of the Lyle Defendants, they converted plaintiffs' funds for their own uses, including using the funds to pay the IRS to settle the IRS Claims.

129.    The IRS has been unjustly enriched as a result of being paid more $9.6 million from funds fraudulently converted from plaintiffs by the Lyle Defendants.

130.    In the absence of the fraud alleged herein, the Shareholders would not have had the funds to pay the settlement to the IRS to avoid the IRS Claims.

131.    As plaintiffs have a superior claim to that of the IRS, plaintiffs demand judgment returning to them all of the approximately $9.6 million paid to the IRS from plaintiffs funds.

SIXTH CLAIM

132.    As and for plaintiffs' sixth claim against the IRS, plaintiffs repeat and reallege the allegations set forth in ¶¶1 through 131, above with the same force and effect as though fully set forth at length herein.

133.    As a result of the foregoing conduct, a constructive trust should be imposed on the IRS for the benefit of the plaintiffs and the more than $9.6 million they received must be returned to plaintiffs.

SEVENTH CLAIM

134.    As and for plaintiffs' seventh claim against the Lyle Defendants and the IRS, plaintiffs repeat and reallege the allegations set forth in ¶¶1 through 133, above with the same force and effect as though fully set forth at length herein.

135.    As against the Lyle Defendants, plaintiffs dominion and control over the Purchase Note, S Tax Note, Shareholder Note and the 6,187,000 Manchester shares was unlawfully and illegally denied plaintiffs.

136.    As a result of the foregoing, plaintiffs are entitled to replevin the Purchase Note, S Tax Note, Shareholder Note and the 6,187,000 Manchester shares.

137.    As against the IRS, plaintiffs' dominion and control over the $9.6 million was unlawfully and illegally interfered with and denied.

138.    As a result of the foregoing, plaintiffs are entitled to replevin the $9.6 million received by the IRS.

## EIGHTH CLAIM

139.    As and for plaintiffs' eighth claim against the Lyle Defendants, plaintiffs repeat and reallege the allegations set forth in ¶¶1 through 138, above with the same force and effect as though fully set forth at length herein.

140.    The Shareholders, aided and abetted continued to perpetuate the fraud by concealing it from the officers and directors of Manchester and the directors of all the plaintiffs after the Acquisition.

141.    The unlawful and illegal fraudulent acts engaged in the Lyle Defendants both before and after the Acquisition constitute a ground for termination of the employment contracts for cause of all the Lyle Defendants.

142.    Plaintiffs seek a declaration of rights that they are entitled to terminate the Lyle Defendants for cause and to enforce the non-solicitation and non-compete provisions of the employment agreements for the balance of the term of such agreements.

143.    In the absence of such relief, plaintiffs would be irreparable harmed.

144.    In the event the Lyle Defendants are terminated and seek to violate the non-solicitation and non-compete provisions of their respective employment agreements, plaintiffs seek preliminary and permanent injunctive relief of any such violations.

NINTH CLAIM

145.    As and for plaintiffs' ninth claim against the Lyle Defendants, plaintiffs repeat and reallege the allegations set forth in ¶¶1 through 144, above with the same force and effect as though fully set forth at length herein.

146.    On or about October 2, 2007, plaintiffs and Lyle entered into a letter of intent detailing the principal terms of a settlement of all disputes between plaintiffs and the Lyle Defendants (the "Settlement Letter").   A copy of that letter of intent is attached hereto as Exhibit 2.

147.    Subsequent to the date of the Settlement Letter, representatives of plaintiffs prepared a definitive settlement agreement to include all the parties Lyle and representatives of plaintiffs had agreed should be included, including the Lender.  The economic terms of the settlement were as set forth in the Settlement Letter.  The additional terms of the agreement included a transition period during which the Lyle's would continue to be employed by the plaintiffs, the terms of such employment and a reduced period of time of sixty days after their termination during which the non-solicitation and non-compete provisions of their employment agreements would apply.  The agreement also included mutual releases among the plaintiffs and the Lyle Defendants and the Lender.

148.    All parties to the negotiations understood that Lyle was acting on behalf of all the Lyle Defendants.

149.    Lyle represented to plaintiffs that the terms of the settlement agreement (the "Settlement Agreement") were satisfactory to him and he and the Lyle Defendants were prepared to proceed on the basis of the settlement.

150.    At all times during the settlement negotiations, Lyle was particularly concerned that the Lender continue to fund the operations of NCA and NCO during the transition and understood that the Lender would only continue to do so if the settlement was reached.

151.    In reliance on Lyle's agreement, plaintiffs agreed that Lyle could reimburse himself for certain advances he had made totaling approximately $95,000. In addition, plaintiffs provided additional collateral to Lender to secure additional loans for the operations of NCO and NCA and the Lender, in reliance on Lyle's agreement, advanced to NCO and NCA $489,360.12, which funds included amounts sufficient to permit Lyle to repay himself the advance he had made.

152.    Based on the foregoing change of position by plaintiffs, the Lyle Defendants are bound by the terms of the settlement.

153.    Despite the agreement of the Lyle Defendants and plaintiffs' reasonable reliance thereon, the Lyle Defendants refused to perform their obligations under the terms of the settlement agreement.

154.    As a result of the breach of the Settlement Agreement by the Lyle Defendants, plaintiffs have been damaged.

155.    Since the Lyle Defendants are judgment proof for amounts in excess of $7 million, plaintiffs will not be able to recover the damages they have suffered as the damages far exceed the amounts to be paid under the terms of the Settlement Agreement.

156.    As a result of the foregoing, plaintiffs will be irreparable harmed if the Settlement Agreement is not specifically enforced.

157.    Plaintiffs seek a preliminary and permanent injunction requiring the Lyle

Defendants to perform the terms of the Settlement Agreement.

Wherefore, plaintiffs demand judgment against the Defendants as follows:

a.    As to Ray Lyle and Victoria Lyle, jointly and severally,  on Claims 1, 2, and 4

    i.    Compensatory damages;

    ii.    Punitive damages;

    iii.    Attorneys' fees;

    iv.    Interest;

    v.    Costs of suit; and

    vi.    Such other and further relief as to the Court may seem just and proper.

b.    As to Ray Lyle and Victoria Lyle, jointly and severally,  on Claim 3

    i.    Compensatory damages;

    ii.    Attorneys' fees;

    iii.    Interest;

    iv.    Costs of suit; and

    v.    Such other and further relief as to the Court may seem just and proper.

c.    As to Ray Lyle, II, Robert Lyle and Ginger Bond, jointly and severally, on Claims

1, 2 and 4

    i.    Compensatory damages;

    ii.    Punitive damages;

    iii.    Attorneys' fees;

    iv.    Interest;

        v.     Costs of suit; and

        vi.    Such other and further relief as to the Court may seem just and proper.

d.     As to Ray Lyle, Victoria Lyle, Ray Lyle, II, Robert Lyle and Ginger Bond, jointly and severally, on Claim 7

        i.     Return of the Manchester Shares, the Purchase Note, S Tax Note, Shareholder Note and amounts paid thereunder;

        ii.    Attorneys' fees;

        iii.   Interest;

        iv.   Costs of suit; and

        v.     Such other and further relief as to the Court may seem just and proper.

e.     As to Ray Lyle, Victoria Lyle, Ray Lyle, II, Robert Lyle and Ginger Bond, jointly and severally, on Claim 8

        i.     Declaration that plaintiffs may terminate the Lyle Defendants as employees of the plaintiffs for cause and that upon such termination the non-solicitation and non-compete provisions of their respective employment agreements are enforceable;

        ii.    Injunctive relief to prevent any violation of the non-solicitation and non-compete provisions of their respective employment agreements;

        iii.   Attorneys' fees;

        iv.   Costs of suit; and

        v.     Such other and further relief as to the Court may seem just and proper.

f.    As to Ray Lyle, Victoria Lyle, Ray Lyle, II, Robert Lyle and Ginger Bond, jointly
and severally, on Claim 9

    i.    Specific performance of the Settlement Agreement;

    ii.    Compensatory damages;

    iii.    Attorneys' fees;

    iv.    Interest;

    v.    Costs of suit; and

    vi.    Such other and further relief as to the Court may seem just and proper.

g.    As to the United States Internal Revenue Service on Claims 4, 5, 6 and 7

    i.    Return to plaintiffs of the approximately $9.6 million dollars paid to them
by Ray and Victoria Lyle from funds defrauded and converted from
plaintiffs;

    ii.    Imposition of a constructive trust on the approximately $9.6 million
dollars paid to them by Ray and Victoria Lyle from funds defrauded from
plaintiffs;

    iii.    Replevin of the approximately $9.6 million dollars paid to them by Ray
and Victoria Lyle from funds defrauded from plaintiffs

    iv.    Interest;

    v.    Costs of suit; and

    vi.    Such other and further relief as to the Court may seem just and proper.

New York, New York
Dated: October 12, 2007

Richard D. Gaines, Esq.
575 Madison Avenue
10th Floor
New York, NY 10022
212-490-3449

## JURY DEMAND

Demand is hereby made pursuant to Fed. R. Civ. Proc. 38 for a trial by jury on all issues so triable on this Complaint.

Dated: October 12, 2007

Richard D. Gaines, Esq.
Attorney for Plaintiffs

**E X H I B I T   1**

# MANCHESTER INC.

100 Crescent Court, 7th Floor
Dallas, TX 75201
(214) 459-3230
(214) 459-8035 facsimile

October 10, 2007

VIA FEDERAL EXPRESS AND CERTIFIED MAIL R/R/R

Ray Lyle, Sr.
Victoria Lyle
1600 Cannon Drive
Fort Oglethorpe, GA 30742

Dear Ray and Victoria Lyle:

This letter and the attachment hereto are submitted in connection with that certain Share Purchase and Exchange Agreement by and among Manchester Inc., Nice Cars Acceptance AcquisitionCo., Inc., Nice Cars Capital Acceptance Corporation ("Nice Cars Acceptance") and the Shareholders of Nice Cars Capital Acceptance Corporation (the "Nice Cars Acceptance Agreement") and that certain Share Purchase and Exchange Agreement by and among Manchester Inc., Nice Cars Operations AcquisitionCo., Inc., Nice Cars, Inc. ("Nice Cars") and the Shareholders of Nice Cars, Inc. (the "Nice Cars Agreement"), each dated October 4, 2006. You constituted at the date of the aforementioned agreements the sole shareholders of both Nice Cars and Nice Cars Acceptance. This letter and the attachment constitute a formal demand for indemnification pursuant to §§3.5(a) and 3.5(d)(ii) of each of the Nice Cars Acceptance Agreement and the Nice Cars Agreement.

The principal bases for the indemnification claims have been communicated to both of you through discussions and materials submitted to Ray Lyle, Sr. over the past several months. As a result of those communications, efforts to reach a complete settlement agreement were entered into and believed to have been successfully concluded until the morning of October 6, 2007. Certain of the claims of Manchester Inc., Nice Cars Operations AcquisitionCo., Inc. and Nice Cars Acceptance AcquisitionCo., Inc. sound in fraud and are addressed outside the Agreements.

The attachment to this letter provides the detail of the bases of the indemnification claims. Since the negotiations concerning the acquisition of Nice Cars and Nice Cars Acceptance were conducted on the basis of a consolidated purchase price which was only allocated after the conclusion of the negotiations, the indemnification claims are made on a consolidated basis.

Ray Lyle, Sr.                                    October 10, 2007
Victoria Lyle                                    Page 2 of 2

You should also be advised that the acts which made the representations and warranties contained in the Nice Cars Agreement and the Nice Cars Acceptance Agreement false and misleading also constitute breaches of your obligations under your respective employment agreements.  The participation of your children in such acts also constitute breaches of their obligations under their respective employment agreements.

In light of the fact that you have represented to me that beyond $7 million you are judgment proof and the fact that our damages far exceed that amount, Manchester must take immediate steps to mitigate its ever growing damages.  Consequently, to avoid any further damages, it will cease making any payments on any indebtedness owed to you as well as such other appropriate action it deems necessary to protect its interest.

Please be further advised not to attempt to transfer any of your assets in an effort to avoid your liability to Manchester.  You have already been advised that litigation has been commenced against you.

.                                               Very truly yours,


                                                Richard D. Gaines
                                                Executive Vice President

INDEMNIFICATION CLAIMS

1.    Paragraph 3.4(w) of the Nice Cars Acceptance Agreement represents and warrants in pertinent part as follows "(w) Accounts Receivable. The accounts receivable carried in NCCAC's books and records: . . . (iv) are collectable in accordance with their terms, subject to the historical bad debt expense incurred by NCCAC[1]. The identical representation is made in paragraph 3.4(w) of the Nice Cars Agreement. These representations and warranties were not accurate at the Closing Date as shown below.

    a.    Ray Lyle and Victoria Lyle (the "Shareholders") represented and provided documentation to support the representation that the historical default rate of all accounts receivable owed from consumers in connection with the sale of used vehicles was less than 30% and on the order of 20%. As of October 4, 2006 (the "Closing Date") the aggregate Accounts Receivable of Nice Cars and Nice Cars Acceptance (the "Nice Cars Companies") which were contractually passed due not more than 60 days (the "Eligible Receivables") was approximately $67.7 million (plus approximately $16.8 million being ineligible). Based on the seasoning and remaining weighted average life of the Eligible Receivables as of the Closing Date, the total additional defaults that should have occurred based on the claimed "historical bad debt expense" would be approximately $9 million. Through the end of August 2007, approximately 11 months after the Closing Date, the total defaults on the Eligible Receivables during that 11 months period were approximately $34.2 million. Based on the documented performance of the Eligible Receivables in existence on the Closing Date, an additional $5 million of defaults is projected making the total defaults since the Closing Date projected to be approximately $39.2 million. This means that the collectibility of the Eligible Receivables will be $22.4 million less than was represented at Closing Date based on the historical bad debt expense. As a result, Manchester Inc., Nice Cars Acceptance AcquisitionCo., Inc. and Nice Cars Operations AcquisitionCo., Inc. (collectively the "Indemnified Parties") demand indemnification for $22.4 million, as adjusted to reflect additional information that is developed from subsequent events or discovery of additional information.

2.    Paragraph 3.4(j) of the Nice Cars Acceptance Agreement represents and warrants as follows: " (j)    Validity of Financial Statements. The audited financial statements of NCCAC prepared by Rodefer Moss & Co, PLLC as of December 31, 2005, December 31, 2004 and December 31, 2003 are true and correct and have been prepared in accordance with generally accepted accounting principles applied on a consistent basis during the periods involved (except as may be otherwise indicated in such financial statements or the notes thereto) and fairly present in all material respects the financial position of NCCAC as of the dates thereof and the results of operations and cash flows for the periods then

---

[1] NCCAC is Nice Cars Capital Acceptance Corporation.

ended.  The unaudited balance sheets and profit and loss statements for the six-month period ended June 30, 2006 and the months ended July 31, 2006 and August 31, 2006, which the Shareholders have delivered to the Company and the Parent fairly present in all material respects the financial position of NCCAC as of the dates thereof."  The identical representation is made in paragraph 3.4(j) of the Nice Cars Agreement.  These representations and warranties were not accurate at the Closing Date as shown below.

a.     The Nice Cars' and Nice Car Acceptance's financial statements reflected reserves for bed debt expense.  The representation coupled with the representations made in paragraph 3.4(w) constituted a representation that the reserves were adequate and based upon the historical bad debt expense of the Nice Cars Companies. They made the identical representation to Rodefer Moss & Co, PLLC, the accounting firm auditing their books and records.  As is demonstrated by the discussion in section  1.a, above, the reserves of approximately $27.2 million on the books of the Nice Cars Companies were grossly inadequate.  The reserves should have been at least $39.2 or at least $12 million more or almost 50% higher than they were.  Consequently, the reserves on the financial statements referenced in the representation contained in paragraphs 3.4 (j) of the Nice Cars Acceptance Agreement and the Nice Cars Agreement are inadequate and understated by at least $12  million and the representation was false at the time it was made on the Closing Date..

At the Closing Date, there was outstanding indebtedness secured by the accounts receivable of the Nice Cars Companies of approximately $34.9 million.  Since the Eligible Receivables were $67.7 million there was approximately $32.8 million of apparent gross equity in the Eligible Receivables.  After projecting the additional $9 million in losses based on the historical bad debt expense history, the adjusted equity in the receivables based on the financial statements was approximately $23.8 million.

The financial statements also showed profits for the fiscal years ended 2003 - 2005 and a projected profit based on profits for the first nine months of 2006 aggregating approximately $17 million.  The financial statements reflected a growth in profits of from approximately $1.5 million in 2003 to a projected profit of approximately 7.5 million in 2006 representing a compound annual rate of growth in profits of 40%.  Based on these materially inaccurate financial statements, Manchester paid the following consideration: (i) paid in full the outstanding debt secured by the Eligible Receivables of $34.9 million, (ii) paid $17.8 million in cash, (iii) issued notes of $6.9 million, $1.2 million, and $627,000, and (iv) issued 6,187,500 Manchester shares (valued at $4 per share for purposes of determining the number of shares to be issued) representing 20% of the outstanding stock of Manchester Inc.  The parties valued the Nice Cars Companies at in excess of $50 million for purposes of determining the number of

shares of Manchester stock to be issued as part of the transaction. This represented a substantial premium over the asset value of the Nice Cars Companies and reflected the strong growth in profits and strong performance of its Eligible Receivables and historical bad debt expense performance. Had the proper reserves being reflected in the financial statements of the Nice Cars Companies and the appropriate adjustments made to the profit and loss statements to reflect these reserves, the financial statements would have been materially different.

The adjusted equity in the Eligible Receivables of $23.8 million would have been reduced to $1,400,000. The profits reflected for the fiscal years ended 2004 and 2005 as well as the profits reflected on the interim financial statements as at July 31 and August 31, 2006 would have been eliminated. Based on the true financial position of the Nice Cars Companies at the Closing Date, the most that would have been paid for the Nice Cars Companies was payment of the debt of $34.9 million and $1,400,000 in cash. No stock or notes would have been issued. Had the true price been paid, the Indemnified Parties would have avoided paying substantial interest on amounts improperly paid to the Shareholders. As a result of the inaccurate representations and misleading nature of the financial statements, the Indemnified Parties demand payment as follows:

i.    Return of all of the 6,187,500 Manchester shares;
ii.   Cancellation of the notes in the original face amounts of $6,930,000, $1,240,764.75 (net of 2005 federal and state income taxes paid by the Company) and $627,542.77 and return of $1,201,230.77 of principal paid with respect to such Notes plus $519,438.73 of interest paid on such notes;
iii.  Return of the $16.4 million cash overpayment to the Shareholders included within the $17.8 million in cash paid at Closing plus the interest at 17.25% and other charges the Indemnified Parties unnecessarily incurred in connection with such overpayment from the Closing Date until the date of payment of such $16.4 million;
iv.   Damages arising from the $3,415,000 of additional borrowings plus interest Manchester has incurred to fund the operations of the Nice Cars Companies because of the high default rate on the Eligible Receivables and the over payments made to the Shareholders based on the false and misleading financial statements;
v.    The $41,080.49 of interest paid to the Shareholders in respect of the $1,421,000 in working capital advances, which advances would have been unnecessary had the Indemnified Parties not grossly overpaid the Shareholders based on the false and misleading financial statements;
vi.   The $170,255 in charitable contributions made based upon an agreement made with the Shareholders which agreement and payment would not have

been made had the true financial condition of the Nice Cars Companies been known; and

vii.    Had the bad debt expense remained at historical levels, since the Closing Date Manchester would have generated $6.4 million more operating profits from the operations of the Nice Cars Companies than it in fact did. The diminution in operating profits is also demanded by the Indemnified Parties.

3.    Paragraph 3.4(g) of the Nice Cars Acceptance Agreement  represents in pertinent part as follows: "(g)   No Undisclosed Liabilities.  NCCAC has no liabilities or obligations that are material, individually or in the aggregate, and that are not disclosed in (i) the financial statements described in Section 3.4(j) of this Agreement; (ii) the releases attached as Exhibit J hereto; or (iii) as disclosed on Schedule 3.4(g) of this Agreement, other than those incurred in the ordinary course of NCCAC's business and which, individually or in the aggregate, are not material to NCCAC."  The identical representation and warranty was made in paragraph 3.4(g) of the Nice Cars Agreement. These representations were false and misleading for the reasons described with respect to the misrepresentations discussed in sections 1.a and 2.a, above.

4.    Paragraph 3.4(h) of the Nice Cars Acceptance Agreement  represents as follows: "(h) No Undisclosed Events or Circumstances.  Except as set fort on Schedule 3.4(h), no event or circumstance has occurred or exists with respect to NCCAC or its business, properties, prospects, operations or financial condition, that, under applicable law, rule or regulation, would require public disclosure under the Securities Act and/or Exchange Act if NCCAC were subject to the reporting requirements of Sections 13 or 15 of the Exchange Act that has not been disclosed in writing to the Company or the Parent."  The identical representation and warranty was made in paragraph 3.4(h) of the Nice Cars Agreement. These representations were false and misleading for the reasons discussed below.

a.    These representations were false and misleading for the reasons described with respect to the misrepresentations discussed in sections 1.a and 2.a, above.  Had the Nice Cars Co and Companies been reporting companies under Sections 13 or 15 of the Exchange Act, the inadequacy of the reserves for bad debt expense and the non-existence of reported profits would have been required to be disclosed.  In addition, as a result of the changes in operations discussed in section 5.a, below, the impact of such changes would also have to have been disclosed.

5.    Paragraph 3.4(n) of the Nice Cars Acceptance Agreement  represents in pertinent part as follows: "(n)   Absence of Certain Changes and Events.  Except as set forth on Schedule 3.4(n), since the end of the period covered by the audited financial statements for the year ended December 31, 2005, the business of NCCAC has been conducted only in the ordinary course consistent with prior practice . . . ".  This representation was inaccurate at the Closing Date for the reasons discussed below.

a.    In an effort to artificially increase the accounts receivable the Nice Cars Companies owned, the Shareholders caused the Nice Cars Companies to reduce the standards for determining the customers who would qualify for credit to purchase used vehicles from Nice Cars. These changes included, but were not limited to substantially reducing the amount of down payments customers were required to pay purchase their vehicles. Further, to the extent the historical bad debt expense was less than 30%, this change would materially and did materially alter what the bad debt expense would be compared to what it had been historically.

The damages incurred as a result of the inaccurate representations and warranties described in paragraphs 3-5, above are subsumed and reflected in the damages described with respect to paragraph 2.

The damages and losses described in this document by the Indemnified Parties are in addition to other damages the Indemnified Parties and other parties have incurred as a result of the false and misleading representations and warranties made by the Shareholders and other employees of the Nice Cars Companies. Claims for such damages are independently recoverable and are or will be sought as well as the above described damages in litigation filed or to be filed.

**E X H I B I T  2**

# MANCHESTER INC.
100 Crescent Court, 7th Floor
Dallas, TX 75201
(214) 459-3230
(214) 459-8035 facsimile

October 2, 2007

Ray Lyle
Nice Cars, Inc.
990 Battlefield Parkway
Ft. Oglethorpe, GA 30742

Dear Ray:

This letter is to confirm our understandings you and Manchester, Inc. reached today based on your discussions with me. Pursuant to our understanding you, on behalf of yourself, your wife and your children (collectively the "Lyles") have agreed to settle all past, present and future potential disputes between the Lyles, on the one hand, and Manchester, Inc., Nice Cars AcquisitionCo, Inc., Nice Cars Acceptance AcquisitionCo, Inc., Nice Cars Funding, LLC and all subsidiaries and affiliates of any of these companies, and their respective officer, directors and employees (collectively "Manchester"), Marvin Keith ("Keith") and Palm Beach Multi-Strategy Fund, L.P. ("Palm Beach"), on the other hand in any way related to, or arising out of, the acquisition ("Acquisition") of Nice Cars, Inc. and Nice Cars Capital Acceptance, Inc. (collectively "Nice Cars") or the operation of the Nice Cars business whether before or after the Acquisition on the following terms.

The Lyles will pay the following to, or for the benefit of, Manchester:

1.    a cash payment to Palm Beach of $7 million for the benefit of Manchester;

2.    Lyles will cancel all outstanding unpaid indebtedness owed to them by Manchester and/or its subsidiaries, including all accrued interest (exclusive of the advances made September 27, 2007);

3.    Return of all the Manchester stock the Lyles received as part of the consideration for the acquisition of Nice Cars, a total of 6,187,500 Manchester shares;

4.    Ray and Victoria Lyle would agree to assign to Manchester their interest in, an amount equal to the tax benefit derived from operating expenses, charge-backs and related operating losses carried back to tax years prior to 2007. Ray and Victoria Lyle and their representatives would work with Manchester and its representatives to achieve the tax benefits to be derived by filing federal and state tax returns including amended returns for prior tax years.

Ray Lyle                                              October 2, 2007
Nice Cars, Inc.                                       Page 2 of 3

5.    In reliance on the good faith efforts of the parties to finalize the terms of this settlement, the
      parties hereby agree that all statutes of limitation with respect to any claim that the Lyles may
      have against Manchester and Palm Beach, and any claim that Manchester and/or Palm Beach
      have against the Lyles shall be tolled until the earlier of the execution of the settlement
      agreement or 10 days after notice by any party to the other parties that they will not proceed
      with the settlement contemplated by this letter.

6.    As part of the settlement, the Lyles, on the one hand, and Manchester, Keith and Palm Beach,
      on the other hand, will execute mutual global full releases, releasing the Lyles, on the one
      hand, and Manchester, Keith and Palm Beach, on the other hand, from any and all
      obligations and claims, whether known or unknown, foreseen or unforeseen, whether fixed or
      contingent, whether liquidated or unliquidated, matured or unmatured, direct, indirect or
      consequential, which any party ever had, now has or may have in the future or arising out of
      or in any way related to: (i) the Share Purchase and Exchange Agreements dated October 4,
      2006; (ii) the Employment Agreements executed by the Lyles; (iii) the operation of the Nice
      Cars business whether before or after the Acquisition.

7.    The parties acknowledge that Ray Lyle is still the either the lessee or the guarantor of Nice
      Cars East Ridge lease and Dalton lease and these leases have a total future lease rental
      obligation of approximately $131,870 (before the October 2007 rent is paid) and the
      definitive agreement will include provisions to either escrow the future rental payments or to
      provide indemnifications to the Lyles for this potential lease obligation and the Lease
      Guaranty which was executed by Keith as part of the Acquisition will remain in full force
      and effect.

8.    We would expect to execute a definitive global settlement and release agreement reflecting
      this agreement by this Friday.

Except for ¶5, this is a nonbinding expression of the intention of the parties with respect to the
proposed settlement.  The parties intend to enter into a binding definitive settlement agreement
reflecting the terms in this letter and additional terms.

My signature below on behalf of Manchester, acts as confirmation and acceptance on behalf of the
Manchester entities.  A facsimile signature or scanned signature of this letter shall have the same
legal effect as an original signature.

                                          Very truly yours,



                                          Richard D.  Gaines
                                          Executive Vice President

Ray Lyle                                October 2, 2007
Nice Cars, Inc.                         Page 3 of 3

ACCEPTED AND AGREED TO:

_____               _____
Ray Lyle                                Marvin Keith


Palm Beach Multi-Strategy Fund, L.P.
By: PBL Holdings


_____               _____
Managing Director                       Managing Director

70686670177

Ray Lyle
Nice Cars, Inc.

October 2, 2007
Page 3 of 3

ACCEPTED AND AGREED TO:

Ray Lyle

Marvin Keith

Palm Beach Multi-Strategy Fund, L.P.
By: PBL Holdings

Managing Director

Managing Director

ROL

17076_00/0701/RLS-005170_2

Ray Lyle                                October 2, 2007
Nice Cars, Inc.                         Page 3 of 3

ACCEPTED AND AGREED TO:

_____               _____
Ray Lyle                                Marvin Keith

Palm Beach Multi-Strategy Fund, L.P.
By: PBL Holdings

_____               _____
Managing Director                       Managing Director

170176_000701/KLS-003170_2