BICKEL & BREWER
William A. Brewer III
Robert L. Garner
567 Fifth Avenue – 50th Floor
New York, NY 10153
212-489-1400

Richard D. Gaines
575 Madison Avenue - 10th Floor
New York, NY 10022
212-490-3449

Attorneys For Plaintiffs Manchester Inc., Nice Cars Funding,
LLC, Nice Cars Acceptance AcquisitionCo, Inc. and
Nice Cars Operations AcquisitionCo, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MANCHESTER INC., NICE CARS FUNDING, LLC, NICE CARS ACCEPTANCE ACQUISITIONCO, INC. AND NICE CARS OPERATIONS ACQUISITIONCO, INC., <br><br> Plaintiffs, <br><br> v. <br><br> RAY LYLE, VICTORIA LYLE, GINGER BOND, RAY LYLE, II, ROBERT LYLE, AND LEEDOM & ASSOCIATES, LLC, <br><br> Defendants. | 07 CIV 8659 (LTS) |

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Manchester Inc. ("Manchester"), Nice Cars Funding, LLC, Nice Cars

Acceptance AcquisitionCo, Inc. and Nice Cars Operations AcquisitionCo, Inc. (collectively,

"Plaintiffs"), by their attorneys, Bickel & Brewer and Richard D. Gaines, Esq., for their Second

Amended Complaint against Defendants allege upon knowledge with respect to their own acts,

and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     This action seeks to vindicate Plaintiffs' contractual rights and obtain redress for securities and common law fraud and other misconduct, including outright theft. In October 2006, Manchester and its affiliates acquired from defendants Ray Lyle and Victoria Lyle (the "Shareholders") all the stock of Nice Cars, Inc. ("Nice Cars") and Nice Cars Capital Acceptance, Inc. ("Nice Cars Acceptance") (collectively, the "Nice Cars Companies"), which, together, finance and sell used cars to purchasers with sub-prime credit in a market segment known as Buy Here-Pay Here (the "BHPH Market"). Rather than reaping the benefits of their bargain, however, Manchester and its affiliates have suffered—and continue to suffer—significant damage at the hands of Defendants.

2.     Despite Manchester's thorough due diligence prior to purchase, Ray Lyle, Victoria Lyle, Ginger Bond, Ray Lyle, II, Robert Lyle (the "Lyle Defendants") and Leedom & Associates, LLC, engaged in a series of misrepresentations to fraudulently conceal the true financial condition of the Nice Cars Companies, including serious deficiencies in their loan portfolio (the primary asset of the Nice Cars Companies) and their bad debt reserves. Unbeknownst to Manchester prior to the acquisition of the Nice Cars Companies (the "Acquisition"), the Lyle Defendants were able to artificially inflate the acquisition price by, *inter alia*, (i) clandestinely lowering credit standards to increase revenues, and (ii) fraudulently manipulating the default rate of their customers' loans  in order to make the loan portfolio look healthy. It was not until after the closing that Manchester learned the truth:  that the condition of the loan portfolio had been materially misrepresented, and the bad debt reserves were grossly inadequate. Based on the representations of the Lyle Defendants and Leedom, the loan portfolio should now contain

2

approximately $45.9 million in current loans. It does not. Since the closing, 45% of the notes

that had been portrayed as current have defaulted, and current loans in the portfolio total only

$23.7 million—a $22.2 million deficiency. In addition, Manchester's post-closing audit revealed

a more than $12 million deficiency in Nice Cars Companies' bad debt reserves, which means that

the Nice Cars Companies—whose net profitability had been represented to be more than a $12

million in 2005 and the first eight months of 2006 —actually had no profits.

      3.      The Lyle Defendants and Leedom have engaged in additional misconduct,

including the expropriation of Plaintiff's confidential business information, bribery and theft.

The Lyle Defendants have systematically expropriated a large quantity of Plaintiffs' business

records and destroyed electronic data—likely to conceal evidence of their misconduct—and in

concert with Leedom, have unlawfully tried to use the expropriated business information in order

to compete with Plaintiffs.

      4.      The Lyle Defendants also have (i) taken unlawful kickbacks from vendors doing

business with Plaintiffs; (ii) stripped components from repossessed vehicles; and (iii) illegally

sold repossessed vehicles for their own profit.

      5.      Unable to resolve this dispute through alternative channels, Plaintiffs now seek

the intervention of this Court.

## JURISDICTION AND VENUE

      6.      The federal claims alleged herein arise under Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t, and Rule

10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

      7.      This Court has jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C.

§78aa, in that the transactions in issue constitute an offer and sale of securities by use of the

means and instrumentalities of interstate commerce, and pursuant to 28 U.S.C. § 1331. This

Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1337(a).

8.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b). The claims

asserted herein arose in this District, the acts and transactions complained of have occurred in

this District, and Defendants have consented to the jurisdiction and venue of this Court.

## PARTIES

9.    Manchester Inc. is a corporation organized under the laws of the State of Nevada,

with its principal office in Dallas Texas. Manchester's stock is publicly traded over the counter.

10.    Nice Cars Acceptance AcquisitionCo, Inc. ("NCA") is a corporation organized

under the laws of the State of Delaware, with its principal office in Dallas, Texas. NCA is a

wholly owned subsidiary of Manchester.

11.    Nice Cars Operations AcquisitionCo, Inc. ("NCO") is a corporation organized

under the laws of the State of Delaware, with its principal office in Dallas, Texas. NCO is a

wholly owned subsidiary of Manchester.

12.    Nice Cars Funding, LLC ("Funding") is a limited liability company organized

under the laws of the State of Delaware, with its principal office in Dallas, Texas. Funding is a

wholly owned subsidiary of NCA.

13.    Ray Lyle ("Lyle"), a/k/a Ray Lyle, Sr., is an individual residing in Georgia who

was the former President and 50% shareholder of each of the Nice Cars Companies. Lyle was

formerly President of NCA and NCO.

14.    Victoria Lyle ("V. Lyle") is an individual residing in Georgia who was the former

Secretary and 50% shareholder of each of the Nice Cars Companies). V. Lyle is the spouse of

Lyle. V. Lyle was formerly Secretary of NCA and NCO.

15.    Ray Lyle, II ("Lyle II") is an individual residing in Georgia who was the Corporate Credit and Collections Manager of each the Nice Cars Companies. Lyle II is a son of Lyle and V. Lyle. Lyle II was formerly Corporate Credit and Collection Manager of NCA and NCO.

16.    Robert Lyle ("R. Lyle") is an individual residing in Georgia who was the former General Manager of each of the Nice Cars Companies. He is a son of Lyle and V. Lyle. R. Lyle was formerly General Manager of NCA and NCO.

17.    Ginger Bond ("Bond") is an individual residing in Georgia who was the former Human Resources Manager of each of the Nice Cars Companies. She is a daughter of Lyle and V. Lyle. Bond was formerly the Human Resources Manager of NCA and NCO. (Bond, Lyle, V. Lyle, Lyle II and R. Lyle are collectively referred to herein as the "Lyle Defendants").

18.    Leedom & Associates, LLC and its subsidiaries ("Leedom") is a group of companies engaged in consulting, training and lending activities for auto dealers in the BHPH Market. Leedom administered the Nice Cars Companies' asset backed line of credit, which received a substantial portion of its funding from credit unions.

## GENERAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

19.    In 2004, Manchester adopted a business model based on the acquisition of used car dealers in the BHPH Market, serving customers with impaired credit or limited credit histories. Beginning in or about late 2004 and continuing through 2005, Manchester sought to identify and negotiate the acquisition of a leading dealer in the BHPH Market. In or about the beginning of 2006, Manchester entered into negotiations with the Shareholders to purchase all the outstanding capital stock of the Nice Cars Companies.

**Defendants Engage In A Scheme To Misrepresent The Financial**
**Condition And Performance Of The Nice Cars Companies**

20.     In connection with the negotiations between the Shareholders and Manchester, the

Lyle Defendants and Leedom provided to Manchester, its attorneys, consultants and other

representatives, and its lender (the "Lender"), substantial documentary and oral information, all

of which was represented to be a true and accurate, showing the current and historical business,

operations and financial condition of the Nice Cars Companies.  In reality, to increase the

perceived value of the Nice Cars Companies, the Lyle Defendants and Leedom, acting in concert,

were engaged in a plan and scheme to sell the Shareholders stock to Manchester at an artificially

high price by fraudulently inflating the value of the Nice Cars Companies (the "Scheme").

21.     In furtherance of the Scheme, the Lyle Defendants and Leedom provided Plaintiffs

with information, including the Nice Cars Companies' audited financial statements, showing,

*inter alia*, that (i) the Nice Cars Companies had profits of $6 million in 2005 and $6.7 million for

the first eight months of 2006; (ii) pre-tax profits were projected to be $8.5-9 million for all of

2006, based on the first eight months' performance; (iii) annual revenue growth was 20%; (iv)

he consumer loan portfolio—Nice Cars Companies' primary asset—would contain

approximately $67.7 million in current receivables at the closing; and (iv) Nice Cars

Acceptance's reserve allowance of $27.2 was sufficient to cover all anticipated losses on the loan

portfolio.  The Lyle Defendants also provided Manchester with static pool data, compiled by the

Nice Cars Companies' third party vendor, which showed loan portfolio charge-off percentages at

below 20%.

22.    A key component of Manchester's due diligence inquiry was its review of data regarding the Nice Cars Companies' consumer loan portfolio and its asset-backed, operating line of credit (the "Credit Line"). Pre-acquisition data provided to Manchester by the Lyle Defendants and Leedom purported to show dramatic annual increases in of the size of the Nice Cars Companies' consumer loan portfolio (their principal assert), *i.e.*, $17 million increases in each of 2003, 2004 and 2005 and a $30 million increase in the first nine months of 2006. The Lyle Defendants and Leedom also provided information purporting to show that historical losses on the loan portfolio generally were less than 20%, and in no event fluctuated to more than 30% of the loans originated. The accuracy of such information was crucial to Manchester, because, among other things, the performance of the loan portfolio dictated the amount that Manchester and its affiliates could borrow to acquire the Nice Cars Companies and operate them after the Acquisition.

23.    The data provided to Manchester was part of the Scheme designed to show that the Nice Cars Companies were worth a premium acquisition price. For example, the profit data purported to show that (i) profits of the Nice Cars Companies were growing at a 40% compound annual rate from the year ended 2003 through August 31, 2006, and (ii) projected profits for 2006 would represent more than 80% of the profits generated during the prior three years and represent a 40% increase over the prior year's profit.

24.    The information provided to Manchester was false. After the Acquisition, Plaintiffs found that (i) the Nice Cars Companies actually had no profits in 2005 and 2006, (ii) the true collectability of the consumer loan portfolio was approximately $22.2 million less than represented by the Lyle Defendants and Leedom; and (iii) the portfolio's loan default rate was more than 50%–approximately two-and-a-half times the default rate represented by the Lyle

7

Defendants and Leedom; and (iv) the bad loan reserves were understated by not less than $12 million.

25.     To further implement their Scheme, the Lyle Defendants reduced the Nice Car Companies' customer lending standards in order to generate an aura of high profitability. Those changes, which were not disclosed to Manchester, included a substantial reduction in the customer credit qualification standards and the requirements for customer down payments. The Lyle Defendants knew that such loan underwriting changes were a significant departure from their historical practices and would result in higher than represented default rate in the loan portfolio.

26.     The Nice Cars Companies' maintained their records in a manner that made it difficult to independently verify the charge-off data for the loan portfolio, and the Lyle Defendants capitalized on that to avoid detection of the false data and misrepresentations provided to Manchester. Although the Nice Cars Companies had a computerized record keeping system produced by Wayne Reeves, it was not integrated with the accounting system. Instead, to produce the Nice Cars Companies' financial statements, Lyle regularly made manual entries and adjustments to entries in the course of passing data from the Wayne Reeves system to the accounting system.

27.     Lyle was principally responsible for maintaining the books and records of the Nice Cars Companies, and, as a former certified public accountant, he knew that his record keeping methodology was difficult for an outsider, such as Manchester, to penetrate. Lyle exploited the quirks of the Nice Cars Companies' record-keeping system to further the Scheme. For example, when Lyle provided information to an outside vendor to prepare a static pool analysis, evaluating the timing of loan defaults and bad debt charge-offs, he omitted a portion of

the write-offs taken with respect to accounts that were not paid off in full—knowing that omission would be difficult to detect.  As a result, the charge-off percentage the Lyle Defendants represented to Manchester was grossly understated.

**The Lyle Defendants and Leedom Had**
**Ample Motive To Defraud**

28.     The Lyle Defendants and Leedom had ample motive to engage in the Scheme. The Shareholders needed cash to resolve an ongoing IRS tax investigation that threatened serious financial consequences for the Shareholders and potential criminal liability for Lyle.  The other Lyle Defendants had very good reason to engage in the Scheme to protect their parents, the Shareholders, and to receive a portion of the proceeds of the sale of the Nice cars Companies. Leedom had a strong interest in a fast sale of the Nice Cars Companies—to extricate itself and its principal clients, the credit unions, from their Credit Line obligations before the Credit Line became under-collateralized and in jeopardy of not being fully repaid.

### The Lyle Defendants

29.     In or about 2005 and the beginning of 2006—at the time negotiations began for Manchester's acquisition of the Nice Cars Companies—the Shareholders were under investigation by the IRS, which was asserting liabilities in connection with tax returns filed for the tax years 2002-2004 (the "IRS Claims").  Five years earlier, Lyle had been convicted and imprisoned for felony tax evasion for 1995 tax filings.  That conviction cost him his career as a certified public accountant, and a second conviction for tax evasion would likely have led to a significant period of incarceration.  Accordingly, the Shareholders and their representatives entered into negotiations with the IRS to settle the IRS Claims.

30.     Because the Shareholders lacked sufficient resources to pay the IRS, the key to settlement of the IRS Claims was a sale of the Nice Car Companies at an artificially inflated price. The likely alternative was an IRS seizure and forced sale of the Nice Cars Companies, which operated under Sub-Chapter S of the Internal Revenue Code, making the Shareholders liable for corporate taxes. A forced sale by the IRS would have cost the Shareholders their entire investment, left the Credit Line only partially paid and left unpaid the IRS Claims.

31.     The IRS was fully aware that the only source of the funds available to the Shareholders to settle the IRS Claims was the sale of the Nice Cars Companies. Based on the expected sale of the Nice Cars Companies to Manchester, the IRS agreed to settle the IRS Claims for $9.6 million dollars, to be paid from the proceeds of the sale of the Nice Cars Companies.

32.     The Lyle Defendants knew that they had to sell their shares for more than $50 million in order to accomplish the following: (i) fulfill the terms of the settlement with the IRS; (ii) have sufficient funds to pay the taxes associated with the sale of the Nice Car Companies; (iii) pay the Nice Cars Companies outstanding Credit Line debt; and (iv) have some money left for the Shareholders themselves. In order to obtain that high a sale price, the Shareholders had to demonstrate to Manchester that (i) that the Nice Cars Companies were very profitable and growing exponentially profitable as their revenues increased; (ii) that the customer loan portfolio was growing and performing at a higher rate than industry average; and (iii) the Nice Cars Companies were increasing revenues at a high rate. Since the Nice Cars Companies were not in such financial condition, the Lyle Defendants—and Leedom—knew that such a showing of high performance and profitability could be made only through a scheme to defraud.

**Leedom**

33.    Leedom also had reason to participate in the fraudulent scheme to induce

Manchester to purchase the Nice Cars Companies at a highly inflated price. The Nice Cars

Companies funded their operations through Leedom—and had done so since in or about 2004—

by means of participation agreements in which a substantial portion of the actual funding was

provided by credit unions including Texas Trust Credit Union (the "Credit Union"). Through

Leedom, the Nice Cars Companies had access to a $35-million line of the "Credit Line" provided

by the Credit Union and secured by Nice Cars consumer notes pledged as collateral (the "Pledged

Notes"). The Credit Line permitted borrowing totaling 60% of the value of the Pledged Notes,

and Leedom, in its capacity as loan servicer, had access to independent data showing that the

performance of the Pledged Notes was deteriorating. Thus, it was in Leedom's interest to assist

in selling the Nice Cars Companies as soon as possible—before the Credit Line became under-

collateralized and in jeopardy of not being fully repaid.

34.    The Shareholders' IRS problems presented another reason for Leedom to

participate in a scheme to sell the stock of the Nice Car Companies quickly and for an inflated

price. A forced liquidation of the Nice Cars Companies to pay off the IRS Claims would have

increased the chance that the under-collateralized Credit Line would not be repaid in full, with

the result that Leedom would suffer substantial loss on its loans, be exposed to liability to the

Credit Union and have its business reputation seriously damaged.

35.    Leedom was an active participant in the Scheme. Leedom periodically provided

Plaintiffs with purportedly independent data to demonstrate the then current performance of the

Nice Cars Companies' loan portfolio. Leedom knew that the data it was providing to Plaintiffs

was false and misleading. Instead of providing information showing Leedom's own knowledge

that the performance of the Pledged Notes was deteriorating, Leedom provided Plaintiffs with

data that was skewed to substantiate the misleading data being provided to Plaintiffs by the Lyle

Defendants.  Leedom did this despite its knowledge that Plaintiffs were relying on the data so

provided in deciding whether to purchase the Shareholders stock and, if so, at what price.

**Manchester And Its Affiliates Acquire**
**The Nice Cars Companies**

36.     In or about the spring/summer of 2006, Manchester and the Shareholders reached

a tentative agreement on a purchase price for the stock of the Nice Cars Companies, based upon

the representations and documents provided by the Lyle Defendants and Leedom.  The negotiated

purchase price was substantially related to that portion of the Nice Cars Companies' loan

portfolio that was available to collateralize the Credit line, namely notes that were current or no

more than 60 days past due ("Eligible Receivables").

37.     Key to the purchase price negotiation was an agreement by the Shareholders to

provide representations and warranties concerning the Nice Cars Companies, including

representations with respect to the current and historical business, financial and operating

condition of the Nice Cars Companies.  To the extent the representations and warranties were

inaccurate, a portion or all of the purchase price would be returned to plaintiffs.

38.     But the purchase price agreement did not end the Scheme.  To satisfy

Manchester's Securities & Exchange Commission filing requirements in connection with the

acquisition, the Nice Cars Companies' 2003 through 2005 financial statements needed an audit

by an accounting firm qualified by the Public Company Accounting Oversight Board

("PCAOB").  The accountants for the Nice Cars Companies were not PCAOB-qualified, so

Manchester brought in its own accountants to re-audit the 2003 through 2005 financials before the closing of the Acquisition.

39.     The Lyle Defendants—under the guise of assisting in the re-audit—provided Manchester's auditors with many of the same misrepresentations made earlier to the Plaintiffs concerning the current and historical business, financial and operating condition of the Nice Cars Companies. Thus, the audited financial statements for years 2003 - 2005 along with the unaudited interim financial statements of the Nice Cars Companies dated August 31, 2006 were provided to Plaintiffs and represented to fairly reflect the financial performance and position of the Nice Cars Companies for the periods indicated.

40.     On October 4, 2006, in substantial reliance on the information and representations provided by the Lyle Defendants and Leedom, the Plaintiffs entered into two stock purchase agreements with the Shareholders (the "Nice Cars SPA" and the "Nice Cars Acceptance SPA") to acquire all the stock of Nice Cars and Nice Cars Acceptance. To effect the acquisition, Manchester created two acquisition subsidiaries, NCA, to acquire the all the stock of Nice Cars Acceptance, and NCO, to acquire the all the stock of Nice Cars. After the Acquisition, Nice Cars and Nice Cars Acceptance were merged into NCO and NCA, respectively, with NCO and NCA continuing as the surviving entities.

41.     Under the terms of the Nice Cars SPA and the Nice Cars Acceptance SPA, the Plaintiffs paid consideration of approximately $58,441,543 as follows: (i) $17,820,000 in cash; (ii) 6,250,000 Manchester common shares, which the parties valued at $4 per share; (iii) a note to the Shareholders in the amount of $6,930,000 (the "Purchase Note"); (iv) a note in the face amount of $1,814,000 for tax reimbursement (the "S Tax Reimbursement Note"); and (v) a note in the amount of $627,543 (the "Shareholder Note").

42.    To provide the funds to effect the purchase of the Shareholders' stock, Manchester created Funding which entered into a loan agreement with the Lender to borrow the funds necessary to pay the $17.8 million cash portion of the consideration, pay in full the $34.9 million owed on the Nice Cars Companies' Credit Line and provide ongoing working capital.

43.    At the closing of the Acquisition, the consideration received by the Shareholders was substantially more valuable that the agreed-upon purchase price because the price of Manchester's publicly traded common stock had increased from $4 per share at the time the purchase price was negotiated to $7.52 per share at the closing.  At that price, the value of the shares received by Shareholders (representing 20% of Manchester's outstanding common shares) was $46,530,000.

44.    The Shareholders used a portion of the proceeds of their deal with Plaintiffs to pay $9.6 million to the IRS to settle the tax liabilities that had been under investigation.  In addition, the Shareholders distributed a portion of the sale proceeds to Lyle II, R. Lyle and Bond.

**The Shareholders' Representations, Warranties
and Indemnification Obligations**

45.    Both the Nice Cars SPA and the Nice Cars Acceptance SPA contain representations and warranties made by each of the Shareholders.  Section 3.4 of each agreement provides that the representations and warranties were an inducement to the Plaintiffs to acquire the stock of the Nice Cars Companies.

46.    Section 3.4 of the Nice Cars Acceptance SPA contains the following representations by the Shareholders:

        i.    (j) Validity of Financial Statements. The audited financial statements of NCCAC prepared by Rodefer Moss & Co, PLLC as of December 31, 2005, December 31, 2004 and December 31, 2003 are true and correct and have been prepared in accordance with generally accepted accounting

principles applied on a consistent basis during the periods involved (except as may be otherwise indicated in such financial statements or the notes thereto) and fairly present in all material respects the financial position of NCCAC as of the dates thereof and the results of operations and cash flows for the periods then ended. The unaudited balance sheets and profit and loss statements for the six-month period ended June 30, 2006 and the months ended July 31, 2006 and August 31, 2006, which the Shareholders have delivered to the Company and the Parent fairly present in all material respects the financial position of NCCAC as of the dates thereof.

ii.     (g) No Undisclosed Liabilities. NCCAC has no liabilities or obligations that are material, individually or in the aggregate, and that are not disclosed in (i) the financial statements described in Section 3.4(j) of this Agreement; (ii) the releases attached as Exhibit J hereto; or (iii) as disclosed on Schedule 3.4(g) of this Agreement, other than those incurred in the ordinary course of NCCAC's business and which, individually or in the aggregate, are not material to NCCAC. The minute books and other records of NCCAC contain a true and complete record, in all material respects, of all action taken at all meetings and by all written consents in lieu of meetings of directors, members, shareholders, the management committee or boards of directors, subcommittees and committees of the boards of directors of NCCAC.

iii.    (h) No Undisclosed Events or Circumstances. Except as set fort on Schedule 3.4(h), no event or circumstance has occurred or exists with respect to NCCAC or its business, properties, prospects, operations or financial condition, that, under applicable law, rule or regulation, would require public disclosure under the Securities Act and/or Exchange Act if NCCAC were subject to the reporting requirements of Sections 13 or 15 of the Exchange Act that has not been disclosed in writing to the Company or the Parent.

iv.     (n) Absence of Certain Changes and Events. Except as set forth on Schedule 3.4(n), since the end of the period covered by the audited financial statements for the year ended December 31, 2005, the business of NCCAC has been conducted only in the ordinary course consistent with prior practice and NCCAC has not: (a) transferred, leased or otherwise disposed of any of its assets or properties other than in the ordinary course of business; (b) waived, released or terminated any material rights, Claims, contracts or leases, as applicable; (c) suffered any material damage, destruction or loss, whether or not such damage, destruction or loss shall have been insured against; (d) suffered any material adverse change in the financial condition, properties or business; or (e) made or entered into any contract or commitment to make any capital expenditure in excess of $100,000. Except as set forth on Schedule 3.4(n), since August 31, 2006,

15

there have not been any dividends or other distributions from NCCAC to any shareholder of NCCAC.

v.    (w) Accounts Receivable. The accounts receivable carried in NCCAC's books and records: (i) are valid; (ii) have arisen solely out of bona fide performance of services and other business transactions in the ordinary course of business consistent with past practice, in each case, with persons other than affiliates; (iii) are not subject to any prior lien and are not subject to valid defenses, set-offs or counterclaims, and there are no refunds, discounts or other adjustments payable in respect of such accounts receivable; and (iv) are collectable in accordance with their terms, subject to the historical bad debt expense incurred by NCCAC.

47.    Section 3.4 of the Nice Cars SPA contains the following representations by the

Shareholders:

i.    (j) Validity of Financial Statements. The audited financial statements of NCI prepared by Rodefer Moss & Co, PLLC as of December 31, 2005, December 31, 2004 and December 31, 2003 are true and correct and have been prepared in accordance with generally accepted accounting principles applied on a consistent basis during the periods involved (except as may be otherwise indicated in such financial statements or the notes thereto) and fairly present in all material respects the financial position of NCI as of the dates thereof and the results of operations and cash flows for the periods then ended. The unaudited balance sheets and profit and loss statements for the six-month period ended June 30, 2006 and the months ended July 31, 2006 and August 31, 2006, which the Shareholders have delivered to the Company and the Parent fairly present in all material respects the financial position of NCI as of the dates thereof.

ii.    (g) No Undisclosed Liabilities. NCI has no liabilities or obligations that are material, individually or in the aggregate, and that are not disclosed in (i) the financial statements described in Section 3.4(j) of this Agreement; (ii) the releases attached as Exhibit J hereto; or (iii) as disclosed on Schedule 3.4(g) of this Agreement, other than those incurred in the ordinary course of NCI's business and which, individually or in the aggregate, are not material to NCI. The minute books and other records of NCI contain a true and complete record, in all material respects, of all action taken at all meetings and by all written consents in lieu of meetings of directors, members, shareholders, the management committee or boards of directors, subcommittees and committees of the boards of directors of NCI.

iii.    (h) No Undisclosed Events or Circumstances. Except as set fort on Schedule 3.4(h), no event or circumstance has occurred or exists with respect to NCI or its business, properties, prospects, operations or financial condition, that, under applicable law, rule or regulation, would require public disclosure under the Securities Act and/or Exchange Act if NCI were subject to the reporting requirements of Sections 13 or 15 of the Exchange Act that has not been disclosed in writing to the Company or the Parent.

iv.    (n) Absence of Certain Changes and Events. Except as set forth on Schedule 3.4(n), since the end of the period covered by the audited financial statements for the year ended December 31, 2005, the business of NCI has been conducted only in the ordinary course consistent with prior practice and NCI has not: (a) transferred, leased or otherwise disposed of any of its assets or properties other than in the ordinary course of business; (b) waived, released or terminated any material rights, Claims, contracts or leases, as applicable; (c) suffered any material damage, destruction or loss, whether or not such damage, destruction or loss shall have been insured against; (d) suffered any material adverse change in the financial condition, properties or business; or (e) made or entered into any contract or commitment to make any capital expenditure in excess of $100,000. Except as set forth on Schedule 3.4(n), since August 31, 2006, there have not been any dividends or other distributions from NCI to any shareholder of NCI.

v.    (w) Accounts Receivable. The accounts receivable carried in NCI's books and records: (i) are valid; (ii) have arisen solely out of bona fide performance of services and other business transactions in the ordinary course of business consistent with past practice, in each case, with persons other than affiliates; (iii) are not subject to any prior lien and are not subject to valid defenses, set-offs or counterclaims, and there are no refunds, discounts or other adjustments payable in respect of such accounts receivable; and (iv) are collectable in accordance with their terms, subject to the historical bad debt expense incurred by NCI.

48.    As set forth herein, the Shareholder representations contained in the Nice Cars SPA and the Nice Cars Acceptance SPA were not only false and misleading, but also made with the knowledge that they were false and misleading for the specific purpose of inducing reliance by the Plaintiffs in acquiring the Shareholders' stock of the Nice Cars Companies.

49.    The financial statements referred to in ¶¶ 3.4(j) of the Nice Cars SPA and Nice Cars Acceptance SPA did not fairly present the financial condition of the Nice Cars Companies or their financial performance.

50.    The inadequate bad loan reserves contravene the representations of ¶¶ 3.4(g) of the Nice Cars SPA and Nice Cars Acceptance SPA to the effect that there were no unknown liabilities.

51.    The non-disclosure of inaccuracies in the financial statements and inadequacy of the loan reserves contravene the representations contained in ¶¶ 3.4(h) of the Nice Cars SPA and Nice Cars Acceptance SPA, to the effect that there is no circumstance that would require disclosure under the Securities Act and/or the Exchange Act if Nice Cars and/or Nice Cars Acceptance were subject to the reporting requirements of Section 13 or 15 of the Exchange Act.

52.    The pre-acquisition modification of lending standards constituted an undisclosed change in the manner in which the Nice Cars Companies conducted their business that was not consistent with past practices in contravention of the representations in ¶¶ 3.4(n) of the Nice Cars SPA and Nice Cars Acceptance SPA.

53.    The Nice Cars Companies' loan portfolio was not in compliance with the representations in ¶¶ 3.4(w) of the Nice Cars SPA and Nice Cars Acceptance SPA, in that those receivables were not collectible subject to the historical bad debt expense, in that defaults from the acquisition date through the end of August 2007 represent a default rate in excess of 50% in contrast to the 20% or even 30% default rate as represented by the Shareholders. The loss suffered by plaintiffs to date as a result of the defaults through August 31, 2007, plus projected losses, is at least $22.4 million.

54.     Sections 3.5 of the Nice Cars SPA and the Nice Cars Acceptance SPA obligate the Shareholders to indemnify the Plaintiffs for damages caused by breaches of the representations and other terms. In October 2007, Plaintiffs made a demand for indemnification pursuant to the terms of the Nice Cars SPA and the Nice Cars Acceptance SPA, but the Shareholders have refused to honor the demand.

**The Lyle Defendants Cover Up The Scheme And Engage In
Other Wrongdoing After The Acquisition**

55.     In conjunction with the Acquisition, the Lyle Defendants signed employment agreements to continue operating the Nice Cars Companies after they were merged into NCA and NCO. The Lyle Defendants then used their positions as officers and employees of NCA and NCO to conduct a cover-up of the Scheme long after the Acquisition was complete.

56.     Almost immediately after the Acquisition, the number of defaulting notes in the loan portfolio escalated significantly above the historical charge-off percentage that had been represented to the Plaintiffs during their pre-acquisition due diligence. Lyle, as President of NCA and NCO, excused the sudden increase in defaults as an aberration and—falsely— represented to Plaintiffs that the number of defaults would return to historical level. In reliance on that representation, Manchester borrowed additional funds—including funds from the Shareholders—to provide operating capital to NCO and NCA. Manchester incurred interest on those borrowings. The default rate did not decline.

57.     On numerous occasions thereafter, Lyle represented to Plaintiffs that the increased loan default rate was either consistent with historical levels or was due to a temporary economic down turn and forecast that the default rate would improve. In reliance on these representations, Plaintiffs continued to permit the Lyle Defendants to operate NCO and NCA. At no time did any

of the Lyle Defendants—as officers and employees of NCA and NCO—reveal or correct the misrepresentations they and Leedom had made regarding the financial condition and operations of the Nice Car Companies.

58.    The Lyle Defendants, acting individually and in concert, also have engaged in a persistent course of misconduct involving bribery and outright theft. At least since the closing of the Acquisition, the Lyle Defendants have (i) consistently obtained unlawful kickbacks from vendors as a condition of doing business with NCO and NCA; (ii) stripped radios and other electronic components from repossessed vehicles and sold the parts on the black market; and (iii) sold repossessed vehicles for their own profit after falsely reporting that those vehicles could not be located or, for other reasons, could not be repossessed.

59.    The Lyle Defendants were terminated from NCA and NCO, for cause, in Octoberr, 2007, and have now unlawfully appropriated Plaintiffs confidential and proprietary business information in order to open used car dealerships, directly or indirectly through intermediaries, in direct competition with NCO or in areas in which NCO and NCA planned to expand operations. Among the confidential information discussed with the Lyle Defendants prior to their termination were the areas where NCO and NCA could expand with greater access to capital. Those discussions included expansion in Georgia and into Alabama. The Lyle Defendants and Leedom, acting in concert, are in the process of opening one or more BHPH used car dealerships, directly and indirectly, in Georgia and Alabama.

60.    Leedom is assisting the Lyle Defendants in their unlawful efforts by providing them financing with the knowledge that the Lyle Defendants are violating their contractual obligations to plaintiffs.

61.    Lyle began his unlawful appropriation of Plaintiffs confidential and proprietary

business plan even before he was terminated.  As the loan portfolio continued deteriorating after

the Acquisition, Lyle—knowing he was subject to termination and a demand for recompense for

the losses suffered by Plaintiffs—began to scheme with the other Lyle Defendants to open their

own operations using the proprietary and confidential information they had developed with

Plaintiffs during their employ with NCA and NCO.

62.    Under the terms of the employment contracts, the Lyle Defendants are required to

maintain the confidentiality of Plaintiffs information and refrain from using it for any purpose,

including for their own accounts.  Paragraph 3(a) of each of the Lyle Defendants' employment

contracts specifically provides:

      a.    Except in the normal and proper course of his duties hereunder the
Employee will not publish, communicate, use for his own account, or
disclose to any other Person without the prior consent of the Corporation,
during or after the Period of Active Employment, any confidential or
proprietary information or material ("Confidential Information") relating
to the Corporation's operations, business, customers, and services which
he may obtain from the Corporation or its officers, directors, or employees,
or otherwise by virtue of the Employee's employment by the Corporation.
The parties agree that such Confidential Information is deemed proprietary
to the Corporation, and all intellectual property rights contained therein, or
derived therefrom, shall at all times remain the exclusive property of the
Corporation. "Confidential Information" includes, without limitation, the
following types of information or material, both existing and
contemplated, regarding the Corporation or its parent, affiliated or
subsidiary corporations ("Related Companies"), and third party vendors,
corporate information, including contractual arrangements, plans,
strategies, tactics, policies, supply agreements, and any litigation or
negotiations; sales, strategies, methods, customer, and customer lists,
educational and training materials, reports, disks, tapes, prospects and
market research data; financial information, including cost and
performance data, debt arrangements; personnel information, including
personnel lists, resumes, personnel data, organizational structure and
performance evaluations; and, technical information, including programs,
and source codes. Notwithstanding the above, any part of the foregoing
Confidential Information shall not be considered confidential or

proprietary information to the extent that it: (i) is in the public domain through no wrongful act or breach on the part of the Employee or any third party, or (ii) was approved for release by written authorization of the Corporation, or (iii) is already known by the Employee at the time of disclosure by the Corporation without similar confidentiality restrictions, or (iv) is or is directly related to a Prior Invention or has been or is independently developed by the Employee as shown by prior written evidence, or (v) is required to be disclosed by the Employee pursuant to a court or administrative order (and the Employee shall promptly inform the Company of any such order to allow the Company, at its expense, to oppose any such order).

63.    The Lyle Defendants also have, and are, engaged in outright theft and destruction of electronic data, much of it likely related to their tortious and unlawful conduct.  During the period just prior to their termination of employment, the Lyle Defendants systematically expropriated a large number of Plaintiffs' business records;  The Lyle Defendants maintain Plaintiffs business records in storage facility under the name of V. Lyle, and the facility manager is denying Plaintiffs' access to the records at the direction of the Lyle Defendants.  Prior to returning her company-owned laptop computer to NCA/NCO, Bond deliberately erased all the data. R. Lyle refused to return his company-owned laptop computer for three days after his termination, during which time he erased all the data.

64.    Under the terms of their employment agreements, each of the Lyle Defendants is required to return all property and records upon the termination of employment with NCA and NCO.  Despite due demand by Plaintiffs, the Lyle Defendants have refused to return all Plaintiffs' property.  Paragraph 3(b) of each of the Lyle Defendants' employment contracts specifically provides:

a.    The Employee agrees that any and all documents or other data, sound or image recordings, fixed in any material form, and property of any nature pertaining to activities and services of the Corporation or to its Related Companies, including the information or materials covered by section 3(a) hereof, in his possession now or at any time during the Period of Active

22

Employment, are and shall be the property of the Corporation and its Related Companies, and that all such documents and all copies of them shall be surrendered forthwith to the Corporation whenever requested by the Corporation. Upon termination of Employee's employment with Employer, Employee agrees to return to Employer all copies and originals of all documents generated by or belonging to Employer or any other documents which may have come into the possession of Employee from Employer as a result of Employee's employment with Employer, including documents containing customer information. Nothing herein shall affect or impair Employee's right to retain personal documents, including without limitation address books, diaries, Rolodex cards, and telephone directories, provided such documents do not contain confidential information.

**The Lyle Defendants Are In Breach Of**
**Their Settlement Agreement**

65.     The Lyle Defendants have breached a settlement agreement with Plaintiffs. On or about October 2, 2007, Plaintiffs and Lyle entered into a letter of intent detailing the principal terms of a settlement of all disputes between Plaintiffs and the Lyle Defendants (the "Settlement Letter").

66.     After the execution of the Settlement Letter, Plaintiffs' representatives prepared a definitive settlement agreement to include all parties, including the Lender, agreed upon by Lyle and the Plaintiffs' representatives. The economic terms were as set forth in the Settlement Letter. The additional terms included (i) a transition period of continued employment for the Lyle Defendants, (ii) the terms of that continued employment; (iii) a reduction (to 60 days) in term of the Lyle Defendants post-termination non-solicitation and non-competition agreements. The agreement also included mutual releases among the parties.

67.     All parties to the negotiations understood that Lyle was acting on behalf of all the Lyle Defendants.

68.    Lyle represented to Plaintiffs that the terms of the settlement agreement (the "Settlement Agreement") were satisfactory to him and that he and the Lyle Defendants agreed to proceed on the basis of the settlement.

69.    At all times during the settlement negotiations, Lyle was particularly concerned that the Lender continue to fund the operations of NCA and NCO during the transition and understood that the Lender would only continue to do so if the settlement was reached. In reliance on Lyle's agreement, Plaintiffs agreed that Lyle could reimburse himself for certain advances he had made totaling approximately $95,000. In further reliance on Lyle's agreement to the settlement, Plaintiffs provided additional collateral to the Lender to secure additional loans for the operations of NCO and NCA. The Lender, in reliance on Lyle's agreement, advanced to NCO and NCA $489,360.12, which funds included amounts sufficient to permit Lyle to repay himself for advances he had made. Based on the foregoing change of position by plaintiffs, the Lyle Defendants are bound by the terms of the settlement. Nevertheless, the Lyle Defendants have refused to perform their obligations under the terms of the Settlement Agreement.

**Plaintiffs Have Suffered Damages As A Direct
And Proximate Result of Defendants Conduct**

70.    Manchester has suffered damages as a direct and proximate result of Defendants' conduct. Plaintiffs' damages include their gross overpayment for the Shareholders' stock of the Nice Cars Companies, and losses arising from the Lyle Defendants' theft, bribery and other unlawful conduct.

71.    Manchester also is suffering damages in the form of higher costs associated with its new business acquisitions. Manchester's uses the value of its own publicly-traded stock to pursue its business strategy: the acquisition of used car dealers who operate in the BHPH

24

Market. Manchester's stock price has dropped, however, due to the substantial losses caused by the high default rate in the loan portfolio it acquired from the Nice Cars Companies. That reduction in value has effectively increased Manchester's cost of acquiring companies.

72.    Had plaintiffs known the true facts concerning the Nice Cars Companies, they would not have consummated the Acquisition or would not have done so at the price they paid.

73.    Plaintiffs are prepared to return all the assets they received from the Acquisition in return for all the consideration they paid for the Acquisition. The Shareholders, however, do not have the resources to pay to Plaintiffs the damages they have caused them. The combined resources of all the Lyle Defendants are not sufficient to pay Plaintiffs the damages they have caused. If the Lyle Defendants and Leedom cannot return the full amount of the consideration that Plaintiffs paid, Plaintiffs are prepared to give those defendants credit for the actual value of the Nice Cars Companies as of the Closing Date, which would not be in excess of $36.3 million, less damages incurred, in exchange for return of the Manchester shares paid as part of the consideration for the Acquisition and cancellation of the Purchase Note, the Tax Note, all as determined by the Court.

### FIRST CLAIM FOR RELIEF

### For Violations of §§ 10(b) and 20(a)
### of the 1934 Act and Rule 10b-5
### (Lyle Defendants, Leedom)

74.    Plaintiffs repeat and reallage the allegations in Paragraphs 1 through 73 above as though fully set forth herein.

75.    The Lyle Defendants and Leedom participated in a wrongful scheme, the implementation of the deceptive devices discussed herein, and/or in the preparation and dissemination of the false statements specified above, which they knew or recklessly disregarded

were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

76.    The Lyle Defendants and Leedom violated Sections 10(b) and/or 20(a) of the 1934 Act and Rule 10b-5 in that they:

        a.    Employed devices, schemes, and artifices to defraud;

        b.    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

        c.    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with their purchase stock of the Nice Cars Companies

77.    The Lyle Defendants' and Leedom's material misrepresentations and/or omissions were made knowingly and/or in reckless disregard of the truth and for the purpose and effect of concealing the Nice Cars Companies' falsified financial results, operating condition and prospects from the Plaintiffs and supporting the artificially inflated price of its securities.

78.    The false and misleading statements, misrepresentations, nondisclosures and/or omissions of material fact set forth above in connection with the sale and/or purchase of the foregoing securities were effected by means and instrumentalities of interstate commerce and the United States mail.

79.    Plaintiffs have suffered damages in that, in reliance on the material misrepresentations and omissions described herein, they paid artificially inflated prices in connection with their purchase of the Nice Cars Companies' securities.  Plaintiffs would not have

purchased Nice Cars Companies' securities at the prices they paid, or at all, if they had been

aware that the price had been artificially and falsely inflated by defendants' wrongful scheme

and/or false and misleading statements.

## SECOND CLAIM FOR RELIEF

### Common Law Fraud
### (Lyle Defendants, Leedom)

80.     Plaintiffs repeat and reallage the allegations in Paragraphs 1 through 79 above as

though fully set forth herein.

81.     As set forth above, the Lyle Defendants and Leedom made false and misleading

statements and omitted information about the financial condition and performance of the Nice

Cars Companies.

82.     Plaintiffs reasonably relied upon the aforesaid false and misleading statements to

their detriment and as a direct and proximate result thereof have been severely damaged.

83.     The Lyle Defendants and Leedom each knew the false and misleading statements,

misrepresentations, nondisclosures and/or omissions of material facts to Plaintiffs as set forth

above in connection with the sale and/or purchase of Manchester, the Nice Cars Companies

securities would be, and were intended to be, relied upon by Plaintiffs.

84.     Had Plaintiffs known the true facts about the Nice Cars Companies, they would

not have consummated the acquisition or would have done so at a reduced price and would not

have executed the Lyle Defendant employment contracts.

85.     Plaintiffs seek rescission of the acquisition and return of all the consideration they

paid for the stock of the Nice Cars Companies plus the damages plaintiffs suffered, which would

not have been suffered had the acquisition not taken place.  Plaintiffs are prepared to return to the

Shareholders either (i) the stock of NCO and NCA, or (ii) the value of NCO and NCA less the damages incurred by plaintiffs, as determined by the Court.

## THIRD CLAIM FOR RELIEF

### Partial Rescission For Securities and Common Law Fraud
### (Lyle Defendants, Leedom)

86.     Plaintiffs repeat and reallage the allegations in Paragraphs 1 through 85 above as though fully set forth herein.

87.     As a result of the Lyle Defendants and Leedom's provision of false and misleading financial statements and other false and misleading information and omissions, Plaintiffs were defrauded and grossly overpaid for the stock of the Nice Cars Companies.

88.     Had the Nice Cars Companies' true financial condition been disclosed, the consideration paid for the stock of the Nice Cars Companies would have been limited to payment of $1.4 million in cash, and payment at closing of Nice Cars Companies' existing bank debt of $34.9 million, and the following consideration would not have been paid to the Shareholders: (i) 6,250,000 shares of Manchester stock; (ii) the $6,930,000 Purchase Note; (iii) the $1,814,000 S Tax Note; (iv) the $627,543 Shareholder Note; and (iv) $16.4 million of cash consideration.

89.     The Lyle Defendants do not have the resources to return to Plaintiffs all the consideration paid to them.

90.     The Lyles Defendants should be required to (i) return the Manchester stock to Plaintiffs, (ii) cancel the Purchase Note and return all interest paid, (iii) cancel the remaining balance of the Tax Note and return all principal and interest paid; (iv) return all principal and interest paid on the Shareholder Note; and (v) return $16.4 milion of the cash consideration, and the Lyle Defendants and Leedom should be required to pay damages.

## FOURTH CLAIM FOR RELIEF
### Constructive Trust
### (Lyle Defendants)

91.    Plaintiffs repeat and reallage the allegations in Paragraphs 1 through 90 above as though fully set forth herein.

92.    As a result of the fraud committed by the Lyle Defendants as described above, Plaintiffs are entitled to rescission of the acquisition and return of the consideration plaintiffs paid.

93.    The Lyle Defendants do not have the financial ability to replace and return to the Plaintiffs the Manchester shares and Notes issued to the Shareholders in consideration of the acquisition.

94.    In order for any judgment obtained by plaintiffs to be effective, the Manchester shares and Notes issued to the Shareholders, and now in the possession of one or more of the Lyle Defendants, must be returned to Plaintiffs.

95.    To preserve Plaintiffs' rights, a constructive trust should be imposed upon the Manchester shares and the Notes issued to the Shareholders in consideration of the acquisition.

96.    The Lyle Defendants should be preliminarily and permanently enjoined from transferring any interest in, or rights to such shares and Notes.

## FIFTH CLAIM FOR RELIEF
### Indemnification
### (Shareholders)

97.    Plaintiffs repeat and reallage the allegations in Paragraphs 1 through 96 above as though fully set forth herein.

98.    The Shareholders breached the representations and other terms of the Nice Cars SPA and the Nice Cars Acceptance SPA.

99.     Sections 3.5 of the Nice Cars SPA and the Nice Cars Acceptance SPA obligate the Shareholders to indemnify the Plaintiffs for damages caused by breaches of the representations and other terms.

100.     As a result of the foregoing breaches, the Plaintiffs have suffered substantial damages and is entitled to indemnification for those damages.

101.     The Shareholders have declined to honor the Plaintiffs' demand for indemnification.

## SIXTH CLAIM FOR RELIEF
### Conversion
### (Lyle Defendants)

102.     Plaintiffs repeat and reallage the allegations in Paragraphs 1 through 101 above as though fully set forth herein.

103.     As a result of the foregoing unlawful and illegal acts, the Lyle Defendants defrauded Plaintiffs and converted their lawful property, including repossessed vehicles, radios and other electronic components, and confidential business plans and information.

104.     The Lyle Defendants have been unjustly enriched.

105.     As a result of the forgoing fraud by the Lyle Defendants, Plaintiffs have been damaged.

## SEVENTH CLAIM FOR RELIEF
### Breach of Contract
### (Lyle Defendants)

106.     Plaintiffs repeat and reallage the allegations in Paragraphs 1 through 105 above as though fully set forth herein.

107.     Under the terms of their employment contracts with Plaintiffs, the Lyle Defendants are required to (i) maintain the confidentiality of Plaintiffs information and refrain

from using it for any purpose, including for their own accounts; and (ii) return all Plaintiffs'

information to Plaintiffs upon termination of employment,

108.    The Lyle Defendants have breached their contracts by expropriating Plaintiffs

confidential business plans and using them to enter into competition with Plaintiffs.

109.    Plaintiffs are suffering damages as a result.

## EIGHTH CLAIM FOR RELIEF
### Tortious Interference With Contract
### (Leedom)

110.    Plaintiffs repeat and reallage the allegations in Paragraphs 1 through 109 above as

though fully set forth herein.

111.    Under the terms of their employment contracts with Plaintiffs, the Lyle

Defendants are required to (i) maintain the confidentiality of Plaintiffs information and refrain

from using it for any purpose, including for their own accounts; and (ii) return all Plaintiffs'

information to Plaintiffs upon termination of employment,

112.    The Lyle Defendants have breached their contracts by expropriating Plaintiffs'

confidential business plans and using them to enter into competition with Plaintiffs.

113.    Leedom knew that the Lyle Defendants had valid employment contracts with

Plaintiffs.

114.    Leedom induced the Lyle Defendants to breach those contracts by offering to

finance their new business venture using Plaintiffs confidential plans.

115.    Plaintiffs are suffering damages as a result.

## NINTH CLAIM FOR RELIEF
### Replevin
### (Lyle Defendants)

116.    Plaintiffs repeat and reallage the allegations in Paragraphs 1 through 115 above as though fully set forth herein.

117.    As against the Lyle Defendants:  the Lyle Defendants have unlawfully interfered with and denied Plaintiffs' dominion and control over the Purchase Note, S Tax Note, Shareholder Note and the 6,250,000 Manchester shares (the "Manchester Shares").

118.    As a result of the foregoing, plaintiffs are entitled to replevin the Purchase Note, S Tax Note, Shareholder Note and the Manchester Shares.

## TENTH CLAIM FOR RELIEF
### Breach of Fiduciary Duty
### (Lyle Defendants)

119.    Plaintiffs repeat and reallage the allegations in Paragraphs 1 through 118 above as though fully set forth herein.

120.    The Lyle Defendants as officers and senior managers of Plaintiffs owed Plaintiffs a fiduciary duty in carrying out their responsibilities.

121.    Among their fiduciary duties was a duty to record and disclose all transactions affecting plaintiffs' property.

122.    Also included within their fiduciary duties was the duty to oversee the Plaintiffs' operations at NCO and NCA to be sure they were conducted in a lawful manner. In addition to their breach of their duty as aforesaid, they also breached it in the following respects.

123.    The Lyle Defendants submitted or caused to be submitted insurance claims for losses where no loss had occurred.

124.    To the extent insurance proceeds were obtained and received by the Plaintiffs on specious loss claims, they caused the Plaintiffs to be exposed to potential liability, both civil and criminal, for insurance fraud.  To the extent the Lyle Defendants obtained insurance proceeds and kept them for themselves, they committed insurance fraud using the assets of the Plaintiffs as part of the scheme..

125.    The activities of the Lyle Defendants constituted breaches of fiduciary duties to Plaintiffs.

126.    To the extent the acts of conversion and breach of fiduciary duty described above constitute violations of the criminal laws of the States of Tennessee, Texas and/or Georgia, the conduct in such criminal activities in operating NCO and NCA constitutes a breach of their fiduciary duties to plaintiffs.

### ELEVENTH CLAIM FOR RELIEF
**Declaratory Relief for Breach of Employment Contract**
**(Lyle Defendants)**

127.    Plaintiffs repeat and reallage the allegations in Paragraphs 1 through 126 above as though fully set forth herein.

128.    The Lyle Defendants continued to perpetuate the fraud by concealing it from the officers and directors and members of all the Plaintiffs after the acquisition.

129.    The unlawful and illegal acts described above constitute a breach of the employment agreements of the respective Lyle Defendants and are grounds for termination for cause under such agreements.

130.    The Lyle Defendants have been terminated for cause.

131.    Plaintiffs seek a declaration of rights that their termination of the employment of the Lyle Defendants for cause was proper and that the non-solicitation and non-compete

provisions of the employment agreements for the balance of the term of such agreements remain enforceable by both preliminary and injunctive relief.

## **TWELFTH CLAIM FOR RELIEF**
### **Breach of Contract - Settlement Agreement**
### **(Lyle Defendants)**

132.    Plaintiffs repeat and reallage the allegations in Paragraphs 1 through 131 above as though fully set forth herein.

133.    As set forth above, the Lyle Defendants have entered into a settlement agreement with Plaintiffs, and Plaintiffs have acted in reliance, to their detriment, on that agreement.

134.    The terms of the settlement provide that the Lyle Defendants shall make a $7 million payment to the Plaintiffs.

135.    Because the Lyle Defendants are "judgment proof" for amounts in excess of $7 million, Plaintiffs will not be able to recover any damages in excess of the amount of the settlement agreement.

136.    As a result of the foregoing, plaintiffs will be irreparable harmed if the Settlement Agreement is not specifically enforced

137.    Plaintiffs seek a preliminary and permanent injunction requiring the Lyle Defendants to perform the terms of the Settlement Agreement.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment for Plaintiffs and against Defendants on all claims and grant relief as follows:

a. for rescission of the purchase agreements;

b. for restitution of the value of all performance by Plaintiff and all benefits conferred upon Defendants by Plaintiffs;

c. for compensatory damages, including consequential and incidental damages, in an amount to be proven at trial, including return of:

    i. the entire purchase price;

    ii. all funds loaned to Defendants; and

    iii. all operating losses incurred by Plaintiffs since the closing;

d. for punitive damages;

e. for imposition of a constructive trust on the Manchester common stock paid as consideration for the acquisition, the Purchase Note, the Tax Note, and the Shareholder Note;

f. for preliminary and permanent injunctive relief prohibiting the Lyle Defendants or anyone acting in active concert with them from:

    i. transferring any of the Manchester common stock paid as consideration for the acquisition, the Purchase Note, the Tax Note, the Shareholder Note or any interest therein any person other than Plaintiffs;

    ii. destroying plaintiffs property or denying or impeding plaintiffs' access to its books and records and property; and

    iii. violating the non-solicitation and non-compete provisions of their respective employment agreements;

g. for an Order requiring the Lyle Defendants to return all property of Plaintiffs;

h. for preliminary and permanent injunctive relief:

    i. prohibiting the Lyle Defendants and Leedom or anyone acting in active concert with them from using Plaintiffs' confidential information as alleged above; and

    ii. affirmatively requiring Lyle and V. Lyle to comply with the terms of the Settlement Agreement;

i.      for a Declaration that the termination of the Lyle Defendants' employment with
        Plaintiffs for cause was proper and that upon such termination the non-solicitation
        and non-compete provisions of their respective employment agreements remain
        enforceable;

j.      for costs including attorneys' fees and the costs and disbursements of this action,
        interest, including pre and post judgment interest; and

k.      for such other relief as the Court deems just and proper.


:Dated:     New York, New York
            November 30, 2007


                                            BICKEL & BREWER


                                            By: _____

                                            William A. Brewer III (WB 4805)
                                            Robert L. Garner (RG 6652)
                                            567 Fifth Avenue – 50th Floor
                                            New York, NY 10153
                                            212-489-1400

OF COUNSEL
Richard D. Gaines
575 Madison Avenue - 10th Floor
New York, NY 10022
212-490-3449

                                            Attorneys For Plaintiffs Manchester Inc.,
                                            Nice Cars Funding, LLC, Nice Cars
                                            Acceptance AcquisitionCo, Inc. And Nice
                                            Cars Operations AcquisitionCo, Inc.

## JURY DEMAND

Demand is hereby made pursuant to Fed. R. Civ. P. 38 for a trial by jury on all issues so triable on this Complaint.

Dated: November 30, 2007

By: _____

William A. Brewer III (WB 4805)
Robert L. Garner (RG 6652)
BICKEL & BREWER
567 Fifth Avenue – 50th Floor
New York, NY 10153
212-489-1400

OF COUNSEL:
Richard D. Gaines
575 Madison Avenue  - 10th Floor
New York, NY 10022
212-490-3449

Attorneys For Plaintiffs
Manchester Inc., Nice Cars Funding, LLC, Nice Cars Acceptance AcquisitionCo, Inc. And Nice Cars Operations AcquisitionCo, Inc.

5147583.2
2050 02

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of November 2007, I caused a copy of the foregoing SECOND AMENDED COMPLAINT AND JURY DEMAND to be served by First Class Mail to:

Judith Lockhart, Esq.
Carter Ledyard & Milburn LLP
2 Wall Street
New York, NY 10005


United States Internal Revenue Service
500 N. Capitol Street, NW
Washington, DC 20221


By: _____
Michael Inman